1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    SHAHID BUTTAR FOR CONGRESS              Case No.  21-cv-05566-EMC
     COMMITTEE, et al.,
8
                    Plaintiffs,
9                                            ORDER GRANTING DEFENDANT'S
           v.                                MOTION TO DISMISS
10
                                             Docket No. 27
11   HEARST COMMUNICATIONS, INC.,

12                  Defendant.

13

14                    I.        **INTRODUCTION**

15         Plaintiffs Shahid Buttar and Shahid Buttar for Congress Committee bring this action

16   against Defendant Hearst Communications, Inc. alleging defamation and a derivative violation of

17   California's unfair competition law.  Plaintiffs' claims arise from two stories published in the *San*

18   *Francisco Chronicle* in July 2020 reporting on allegations that Buttar, then a candidate for

19   Speaker Nany Pelosi's seat in the U.S. House of Representatives, sexually harassed an individual

20   several years earlier.  The *Chronicle* stories summarized the substance of the allegations that the

21   individual, Elizabeth Croydon, published online in an essay on the website *Medium*, included

22   Buttar's denial of those allegations, and detailed the actions undertaken in response to the

23   allegations by some of Buttar's political supporters.

24         Now pending is Defendant's motion to dismiss the complaint in its entirety under Fed. R.

25   Civ. P. 12(b)(6) and California's anti-SLAPP statute.  Docket No. 27 ("Mot.").  For the following

26   reasons, the Court **GRANTS** Defendant's motion.

27

28

## II.   <u>BACKGROUND</u>

A.   <u>Factual Allegations</u>

In July 2020, Plaintiff Buttar was a candidate in the November 3, 2020 general election for California's 12th U.S. Congressional District in the 2020 general election, seeking to unseat U.S. Rep. Nancy Pelosi, the sitting Speaker of the House. Docket No. 1 ("Compl.") ¶ 9.  Plaintiff Shahid Buttar for Congress Committee was an unincorporated organization constituting Buttar's campaign.  *Id.* ¶ 13.

On July 21, 2020, an acquaintance of Buttar, Elizabeth Croydon ("Croydon"), published an essay on the web site Medium.com titled "*Shahid Buttar Repeatedly Sexually Harassed Me*."  *Id.* ¶ 16; Docket No. 28 ("Ibarguen Decl."), Exh. G ("Croydon Essay).[1]  In her essay, Croydon alleged, that when she and Buttar were both living In Washington, D.C., in the early 2000s and were part of the same activism and arts community, Buttar "made [her] feel uncomfortable"; "repeatedly pursued [her] for sex"; and "let [her] know that he was sexually available to [her] for years."  Croydon Essay at 1.  Croydon described an instance roughly a decade later in which she said she was "shocked and embarrassed" when, after Croydon discussed her celibacy, Buttar allegedly responded with comments that Croydon wrote made her feel "degraded, nauseated, and revolted that he would mock me in front of friends who looked to me as an outspoken voice for women."  *Id.* at 1-2.  Croydon concluded by expressing her opinion: "We on the left must hold ourselves to a higher standard as we are committed to creating a just and equitable world, free from sexual misconduct, misogyny and bullying . . . . The left can do better than Shahid Buttar."  *Id.* at 2-3.

That same day, Defendant Heart published an article in the *San Francisco Chronicle,* written by reporter Joe Garofoli, regarding the public controversy sparked by the allegations in the

---

[1] The Court refers to the contents of Croydon's Essay because it is incorporated by reference to the Complaint because it is explicitly referred to and hyperlinked in the Complaint, central to Plaintiffs' claims, and Plaintiffs do not dispute the authenticity of the document. *United States v. Corinthian Colls.*, 655 F.3d 984, 999 (9th Cir. 2011).  For the same reasons, each of the documents in Defendant's Requests for Judicial Notice, Docket Nos. 28, Docket No. 33 n. 2, are incorporated by reference.  To the extent Plaintiffs object to the Court taking judicial notice of these documents because they do not satisfy Fed. R. Evid. 201 or contain disputed facts, *see* Docket No. 32 at 5, these objections are not applicable because the Court does not refer to the contents of the documents for their truth or accuracy.

United States District Court
Northern District of California

1  Croydon Essay, titled "Shahid Buttar, Nancy Pelosi's election opponent, accused of sex

2  harassment" (the "First Article").  Compl. ¶¶ 2, 15; Ibarguen Decl., Exh. A ("First Article").  The

3  First Article, published online at 8:19pm on July 21, 2020, included a hyperlink to Croydon's

4  Essay, *id.* ¶ 45.  Prior to publishing the article, Garofoli corresponded with the Buttar for Congress

5  Committee and received a statement from the committee.  *Id.* ¶ 18.  The First Article included

6  statements from Buttar denying the accusations and that, "Every survivor must be heard, and I

7  hope to be allowed the same opportunity to be heard as well. . . Sexual harassment is despicable.

8  Those who exploit structural sexism and power imbalances must be exposed.  I am committed to

9  putting survivors' interests before my own."  First Article at 2.

10        The First Article also reported on public pronouncements by two political organizations

11  that had previously endorsed Buttar's candidacy, which said they were reevaluating their

12  endorsements in light of the allegations, and also that one local elected official reacted to the

13  allegations by having his name removed from Buttar's website and signing "a . . . petition to

14  unendorse him."  *Id*.  The First Article quoted Buttar's statement in response to these political

15  consequences: "I invite their examination of the issues and our campaign welcomes any scrutiny."

16  *Id*.

17        Approximately ten minutes *after* the First Article was published online on July 21, a Buttar

18  Campaign representative emailed reporter Garofoli offering to connect the newspaper with "some

19  people who can speak about [Mr. Buttar's] character and other claims [Ms. Croydon] has made in

20  the past that are false – including one who alleges that she also made false claims about her

21  husband.  Would you want to speak with them?  We are reluctant to attack her character out of

22  respect to survivors . . . but they are willing to speak with you."  Compl. ¶ 21 (alteration in

23  original) (emphasis omitted); *see also* Docket No. 34 ("Email Correspondence") at 6.  That same

24  evening, a different publication, *The Bay Area Reporter*, published an article regarding Croydon's

25  accusations against Buttar, and included quotations from two individuals who claimed to have

26  known Buttar in the 2000s and opined that Croydon's allegations lacked credibility, that Buttar

27  was an individual with integrity, and that Croydon has falsely accused another lawyer of sexual

28  assault in 2006.  Compl. ¶ 28.

United States District Court
Northern District of California

1       At 5:44 a.m. on July 22, 2020, the day after Defendant published the First Article, a

2    representative of Buttar's campaign emailed reporter Garofoli asserting that "Ms. Croydon's

3    allegations about Mr. Buttar were false," and that "a number of voices had been left out" from the

4    First Article. Compl. ¶ 30.  The email thanked Garofoli for his coverage, and suggested that "there

5    is a lot more to this story that we think will be illuminating."  Email Correspondence at 6.  The

6    campaign representative noted that "[d]ue to time limits" the campaign "did not have time to

7    arrange" more interviews or voices to be included in the First Article, and asked Garofoli, "Can

8    we do a follow up today or soon?"  *Id.*  The email did *not* identify any false claims in the First

9    Article or demand any corrections or retractions.  Instead, the email states, "We would like a story

10   that offers Shahid the opportunity to give his perspective here and invites others who are close to

11   this situation.  We gave a limited response, but given more time, we could really tell a much

12   bigger picture.  Can you advise on what opportunities might be available for that?"  *Id.*  Reporter

13   Garofoli responded to the campaign representative by suggesting that "one opportunity that might

14   be available would be an Op-Ed.  Our editorial page director. . . said he would entertain reviewing

15   one."  *Id.* at 5.  The campaign submitted an op-ed; however, it was not ultimately published.

16   Compl. ¶ 31.

17       Two days later, on July 24, 2020, a group of 17 individuals published an "Open Letter of

18   Support for Shahid Buttar" (hereinafter, the "Open Letter") on a website called *Independent*

19   *Political Report* asserting, among other things, that Croydon's allegations "attempted to draw a

20   different picture of Shahid than the one we know to be true."  Compl. ¶ 38; Ibarguen Decl. Exh. H.

21   The signatories of the Open Letter stated the opinion that they "believe these allegations are false

22   and ill intentioned," and asserted that, based on unrelated actions they attributed to Croydon, the

23   signatories believed "[s]he is NOT a credible witness." Compl. ¶ 38; Ibarguen Decl. Exh. H ("The

24   accuser is well known in the DC social justice community.  Unfortunately, this troubled individual

25   has a long history of fabricating attacks against innocent people").  However, the Open Letter did

26   not contain any assertions that any of the signatories had any direct knowledge regarding the truth

27   of Croydon's claims about Buttar.

28       On July 24, 2020, Defendant published another article ("Follow Up Article") about the

controversy in the *San Francisco Chronicle*, titled "Longtime activists defend Pelosi foe Shahid Buttar against sex harassment accusations."  Compl. ¶¶ 41-45. [2]  The article referred to and quoted the Open Letter, quoted several activists who signed the Open Letter, and restated Buttar's position that "Croydon's charges are false."  Ibarguen Decl., Exh. B.  Plaintiffs allege, however, that the Follow Up Article was misleading because it portrayed those who spoke out in Buttar's defense as his friends, rather than as independent political activists, and did not sufficiently detail Croydon's allegedly "long history of false accusations against political activists."  Compl. ¶¶ 42-43.

Two months later, on September 25, 2020, Plaintiffs allege that a different publication, *The Intercept*, published an article stating that, based on its investigation, it was "not able to corroborate Croydon's allegations" and that publication interviewed multiple sources "who recounted having disturbing interactions which her that caused them to question her credibility." Compl. ¶ 39.

Plaintiffs allege that, "[h]ad Mr. Buttar been a White male, rather than an immigrant Muslim, the *Chronicle* would not have recklessly rushed to the publish [the First Article], much less publish it.  Instead, the *Chronicle* would have thoroughly investigated whether or not Ms. Croydon's allegations were credible."  Compl. ¶ 47.  Plaintiffs allege that the First Article "delivered crippling blows to Mr. Buttar's insurgent campaign," who was ultimately defeated by Speaker Pelosi, and the false allegations in the First Article "recklessly and unjustly smeared Mr.

---

[2] Plaintiffs' argument that their claims are brought on the print versions of Hearst's Articles, dated July 22 and 25, 2020, as republications of the online versions of identical articles published online by Defendant the evenings before references the single-publication rule.  The single-publication rule deals with calculating the timing of the statute of limitations, which is not at issue here.  *See, e.g.*, *Traditional Cat Ass'n, Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 399-404 (2004) (explaining the historical and legal rationale for California's adoption of the single-publication rule, describing it as a policy adopted to ensure the meaningful application of statutes of limitation on the timing of libel claims).  Plaintiffs do not assert that the content of the online and print publications differs in any way other than the medium.  In any event, Plaintiffs' claims treat the two sets of publications as one and the same, as evidenced by the Complaint's acknowledgement that Hearst's first article on this matter was published July 21, 2020, Compl. ¶¶ 2, 15 n.2, and their allegations that Hearst "[made] matters worse" by including in both articles a hyperlink (which are digital links that cannot be included in print publications) to Croydon's self-published essay on Medium but "did not even provide a hyperlink to the Open Letter."  Opp. 11, 13 (emphasis omitted); Compl. ¶¶ 44-45.  Accordingly, the Court also treats the online and print versions of the Articles as the same, and refers to the initial online publication date of each Article.

United States District Court
Northern District of California

1    Buttar's ethics and integrity, harmed his professional livelihood and personal relationships,

2    slashed his speaking and writing opportunities, and gravely damaged the public's perception of his

3    fitness to hold political office." *Id.* ¶ 51.

4          Plaintiffs allege two causes of action.  First, Plaintiffs allege defamation at common law

5    and under Cal. Civ. Code § 45 because the "*Chronicle* published Ms. Croydon's false allegations

6    with actual malice," and "failed to contact individuals. . . [who] would have provided details of

7    Ms. Croydon's history of lobbing false allegations."  *Id.* ¶¶ 57-58.  Second, Plaintiffs allege a

8    derivative violation of California's unfair competition law based on Defendant "maliciously

9    defaming Buttar for Congress and Mr. Buttar."  *Id.* ¶ 65-66.

10   B.    Procedural Background

11         Plaintiffs filed the operative complaint on July 20, 2021.  Docket No. 1.  Now pending is

12   Defendant's motion to dismiss the complaint and strike it pursuant to California's anti-SLAPP

13   statute.  Docket No. 27 ("Mot.").

14                            **III.    LEGAL STANDARDS**

15   A.    Failure to State a Claim (Rule 12(b)(6))

16         Federal Rule of Civil Procedure 8(a)(2) requires a "pleading that states a claim for relief"

17   to include "a short and plain statement of the claim showing that the pleader is entitled to relief."

18   Fed. R. Civ. P. 8(a)(2).  A pleading that fails to meet this standard may be dismissed pursuant to

19   Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after

20   the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic*

21   *Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the pleading]

22   'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*,

23   765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the [pleading] as

24   true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek*

25   *v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

26   [pleading] . . . may not simply recite the elements of a cause of action [and] must contain

27   sufficient allegations of underlying facts to give fair notice and to enable the opposing party to

28   defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus &*

United States District Court
Northern District of California

1    *Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the

2    Plaintiff pleads factual content that allows the court to draw the reasonable inference that the

3    Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility

4    standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that

5    a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

6    B.    California's anti-SLAPP Statute

7           California's anti-SLAPP Statute allows for pre-trial dismissal of "SLAPPs" ("Strategic

8    Lawsuits against Public Participation").  Cal. Civ. Proc. Code § 425.16; *Metabolife Int'l, Inc. v.*

9    *Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  The statute aims to identify, early in the litigation

10   process, "meritless first amendment cases aimed at chilling expression through costly, time-

11   consuming litigation." *Metabolife*, 264 F.3d at 839.

12          "A court considering a motion to strike under the anti-SLAPP statute must engage in a

13   two-part inquiry." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003).  First, the

14   defendant must "make an initial prima facie showing that the plaintiff's suit arises from an act [by

15   the defendant] in furtherance of the defendant's rights of petition or free speech." *Id.* (citation

16   omitted).  As § 425.16 provides:

17                  [An] act in furtherance of a person's right of petition or free speech
                    under the United States or California Constitution in connection
18                  with a public issue includes:

19                  (1) any written or oral statement or writing made before a
                    legislative, executive, or judicial proceeding, or any other official
20                  proceeding authorized by law;

21                  (2) any written or oral statement or writing made in connection with
                    an issue under consideration or review by a legislative, executive, or
22                  judicial body, or any other official proceeding authorized by law;

23                  (3) any written or oral statement or writing made in a place open to
                    the public or a public forum in connection with an issue of public
24                  interest; or

25                  (4) any other conduct in furtherance of the exercise of the
                    constitutional right of petition or the constitutional right of free
26                  speech in connection with a public issue or an issue of public
                    interest.
27

28   Cal. Civ. Proc. Code § 425.16(e).

1   Second, where a defendant makes the required prima facie showing, "the burden shifts to

2   the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Vess*, 317 F.3d

3   at 1110. If, as here, "a defendant makes an anti-SLAPP motion to strike founded on purely legal

4   arguments, then the analysis is made under Fed. R. Civ. P. 8 and 12 standards." *Planned*

5   *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir.), *amended*,

6   897 F.3d 1224 (9th Cir. 2018). "If a defendant makes a special motion to strike based on alleged

7   deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a

8   motion under Rule 12(b)(6)." *Id.* at 834. Accordingly, the procedural grounds for dismissal under

9   anti-SLAPP are identical to those under Rule 12(b)(6): a plaintiff's "[f]actual allegations must be

10   enough to raise a right to relief above the speculative level. . . that is, a claim to relief that is

11   plausible on its face." *Twombly*, 550 U.S. at 555-56, 569.

## IV.   ANALYSIS

A.   Section 425.16 Applies to Plaintiffs' Claims

13   Plaintiffs concede that their claims arising from Defendant's publication of new articles

14   regarding a public controversy involving a candidate for the U.S. House of Representatives is

15   covered by California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16(e). Docket No. 30

16   ("Opp.") at 9 n.37 ("Plaintiffs do not dispute that the first prong of the anti-SLAPP analysis has

17   been satisfied."). Thus, Defendant has made out a prima facie showing that the anti-SLAPP

18   statute applies. Accordingly, the burden shifts to Plaintiffs to demonstrate "a probability of

19   prevailing on the[ir] claim" of defamation. *Varian Med. Sys., Inc. v. Delfino*, 35 Cal. 4th 180, 192

20   (2005) (citation omitted).

B.   Sufficiency of Plaintiffs' Defamation Claim

1.   Legal Standard for Defamation of a Public Figure by a Newspaper on a Matter of
     Public Concern

25   To succeed on a defamation claim, the First Amendment and the anti-SLAPP statute place

26   the burden on Plaintiffs to show that each statement which they claim is defamatory is, in fact,

27   materially false in the context of the whole publication. *See Phila. Newspapers, Inc. v. Hepps*,

28   475 U.S. 767, 775 (1986); *Vogel v. Felice*, 127 Cal. App. 4th 1006, 1021-23 (2005). In a

United States District Court
Northern District of California

8

1   defamation action against a newspaper by a private person suing over statements of public concern

2   the First Amendment places the burden of proving falsity on the plaintiff. *Id.* at 768–769; *Smith v.*

3   *Maldonado*, 72 Cal.App.4th 637, 646, n.5 (1999). As a matter of constitutional law, therefore,

4   media statements on matters of public interest "must be provable as false before there can be

5   liability under state defamation law." *Milkovich v. Lorain Journal Co*, 497 U.S. 1, 18–20 (1990).

6       Plaintiffs' burden to plead, and prove falsity cannot be satisfied, as a matter of law, if the

7   challenged statements are substantially true, that is, if "the substance, the gist, the sting, of the

8   libelous charge [is] justified." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)

9   (citation omitted). In evaluating whether challenged statements are substantially true, a court must

10  examine whether a statement "would have a different effect on the mind of the reader from that

11  which the pleaded truth would have produced." *Id.* (citation omitted). Whether a statement

12  contains provably false factual assertions is a question of *law* for the trial court to decide. *Copp v.*

13  *Paxton*, 45 Cal.App.4th 829, 837 (1996).

14      Moreover, the parties are in agreement that Plaintiff Buttar was a public figure at the time

15  of the alleged libelous speech, and, thus, a heightened standard stemming from the First

16  Amendment applies to his common law defamation claim. "If the person defamed is a public

17  figure, he cannot recover unless he proves, by clear and convincing evidence, that the libelous

18  statement was made with "'actual malice'—that is, with knowledge that it was false or with

19  reckless disregard of whether it was false or not." *Reader's Dig. Assn. v. Superior Ct.*, 37 Cal. 3d

20  244, 256 (1984) (citing *New York Times Co. v. Sullivan, supra,* 376 U.S. 254, 285–286 (1964)).

21  In the context of public figure defamation actions, the "clear and convincing standard" requires a

22  showing that the defendant "entertained serious doubts as to the truth of the publication." *Sipple*

23  *v. Found. For Nat'l Progress*, 71 Cal. App. 4th 226, 248 (1999).

24      The heightened standard has teeth at the pleading stage and, thus, in the preliminary

25  context of an anti-SLAPP motion. "[C]ourts have found that general allegations that a defendant

26  should have known or should have investigated the truth of his or her statements do not adequately

27  plead actual malice." *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1239 (N.D. Cal. 2014). As the court

28  noted in *Padres L.P. v. Henderson*, 114 Cal. App. 4th 495, 509 (2003),"where an element of a

United States District Court
Northern District of California

9

claim must be proven by clear and convincing evidence at trial, the sufficiency of the plaintiff's

prima facie showing on an anti-SLAPP motion is determined with the higher standard of proof in

mind." *See Nicosia v. De Rooy*, 72 F.Supp.2d 1093, 1109 (N.D. Cal. 1999) ("conclusory

statements that [a defamation defendant] should have known the truth does not satisfy the

heightened pleading standard" of actual malice); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*,

302 F. Supp. 3d 1005, 1019 (N.D. Cal. 2017) (citing *Wynn*'s description of the actual malice

pleading standard as a "demanding burden," and dismissing defamation complaint, as a matter of

law, where plaintiff did not "provide any specific allegations that would support a finding that

[defendants] harbored serious subjective doubts as to the validity" of the challenged statements);

*Tull v. Higgins*, No. 21-cv-01566, 2021 WL 6116971, at *9 (N.D. Cal. Dec. 27, 2021) (dismissing

defamation claim as a matter of law for failure to adequately plead actual malice, noting that

where "allegation lacks supporting details and is entirely conclusory[,] [i]t fails to satisfy the

demanding burden of pleading actual malice.").

        2.    <u>Falsity</u>

      As an initial matter, Plaintiffs do not plead that any specific statement published by

Defendant was false.  Rather, Plaintiffs plead generally that they were defamed by the publication

"of an article containing" Croydon's allegations that Buttar sexually harassed her.  Compl. ¶¶ 2,

56.  In an action for defamation implicating the First Amendment, generalized allegations of

defamation without specific allegations of the challenged speech are typically insufficient.

*Flowers v. Carville*, 310 F.3d 1118, 1130-31 (9th Cir. 2002) ("We have held that 'where a plaintiff

seeks damages ... for conduct which is prima facie protected by the First Amendment, the danger

that the mere pendency of the action will chill the exercise of First Amendment rights requires

more specific allegations than would otherwise be required.'") (quoting *Franchise Realty

Interstate Corp. v. S.F. Local Joint Executive Bd. of Culinary Workers*, 542 F.2d 1076, 1082–83

(9th Cir. 1976)); *see also Glassdoor, Inc. v. Superior Ct.*, 9 Cal. App. 5th 623, 636 (2017) (the

court "must determine whether a prima facie showing of actionable statements has been made,"

noting that it "is impossible to perform such a task without knowing the exact statements on which

liability is predicated"); *Sullivan*, 376 U.S. at 285 (courts must review the actual statements

1   alleged to be defamatory to determine whether they are "of a character which the principles of the

2   First Amendment . . . protect" (citations omitted)).  Plaintiffs neither specifically allege, nor do

3   they argue that have identified any particular published statements that were false.  The First

4   Article's description of the essay containing Croydon's allegations has not been challenged by

5   Plaintiff as inaccurate.

6          Instead, Plaintiffs' theory of actionable speech boil down to Defendant's publication of

7   articles which reported Croydon's public allegations that Buttar sexually harassed her *together*

8   *with* Defendant's failure to adequately challenge Croydon's credibility with regard to those

9   allegations.  *See generally* Compl.  But for Plaintiffs to plausibly state a claim of defamation under

10  this theory, they must show falsity by alleging facts that demonstrate the gist or sting of the

11  challenged Articles "would have a different effect on the mind of the reader from that which the

12  pleaded truth would have produced."  *Masson*, 501 U.S. at 517 (citation omitted).  To determine

13  the effect of an allegedly libelous statement on a reader, a court must look at the allegedly

14  defamatory statement in the context of the whole publication of which it is a part.  *Issa v.*

15  *Applegate*, 31 Cal. App. 5th 689, 713-14 (2019); *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d

16  1036, 1040 (9th Cir. 1998) ("[A] defamatory meaning must be found, if at all, in a reading of the

17  publication as a whole. Defamation actions cannot be based on snippets taken out of context.").

18         Defendant's First Article reported on (a) the fact that allegations regarding Buttar were

19  made in Croydon's Essay, a fact pled by Plaintiffs, Compl. ¶ 16; (b) that Buttar had already issued

20  a denial of those allegations in which he explicitly stated that "[e]very survivor must be heard and

21  *I hope to be allowed the same opportunity to be heard as well*" (emphasis added), Compl. ¶ 18;

22  First Article; and (c) that some political organizations and others who had previously voiced

23  public support for Buttar's candidacy had already publicly reconsidered that support in light of the

24  allegations, a reality that Buttar acknowledged *before* Hearst had published on this matter – and

25  Buttar's acknowledgment was included in the article.  First Article ("Buttar said, 'I invite their

26  examination of the issues and our campaign welcomes any scrutiny.'").  Defendant's Follow Up

27  Article reported on these same topics in light of the Open Letter, which was published by Buttar

28  supporters several days after the controversy first arose, and included statements of support from

United States District Court
Northern District of California

11

several individual who knew Buttar and vouched for his integrity and character.  Compl. ¶ 38.

Plaintiffs do not plead that the Articles contained any factual inaccuracies in its account of the *substance* of Croydon's allegations (apart from their denial of the allegations themselves, which Defendant reported), nor do they allege that Hearst's reporting on Buttar's denial of the allegations contained any factual errors.  Plaintiffs do not plead that Hearst's Reporting presented Croydon's allegations of sexual harassment as statements of fact that Buttar actually harassed Croydon.  Nor could they.  Hearst's Reporting does not assert or imply that Croydon's allegations were anything more than her unproven claims, which were disputed by Buttar.  *Cf. Thomas v. L.A. Times Commc'ns, LLC*, 189 F. Supp. 2d 1005, 1015 (C.D. Cal. 2002) (granting anti-SLAPP motion where article "merely states 'opinion[s] on matters of public concern that do not constitute or imply a provable factual assertion.'") (quoting *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995).

Instead, Plaintiffs' allegation of falsity is based on Defendant's failure to do more: Defendant did not interview and quote the Campaign's preferred sources and did not report on allegations by those sources that Croydon had made false reports of sexual harassment against other individuals in the past.  Compl. ¶¶ 21, 43.

However, Plaintiffs do not allege that any of their preferred sources could have offered anything but their own speculation about any of Croydon's allegations against Plaintiff Buttar. Plaintiffs do not allege that those sources had *any* firsthand knowledge as to the veracity of Croydon's allegations.  There is no allegation that Defendant's omission of quotations from these sources renders anything in either Article provable as false.  Moreover, Plaintiffs fail to demonstrate through their pleading that the inclusion of the opinions of the Campaign's preferred sources about Croydon's credibility based on unrelated conduct, in light of the fact that Defendant repeatedly reported Plaintiff Buttar's denial of the allegations, would have created a "different effect on the reader."  *Masson*, 501 U.S. at 517 (citation omitted).  Accordingly, Plaintiffs pleading of falsity appears problematic.

Plaintiffs add two additional claims of falsity specific to the Follow Up Article.  First, Plaintiffs allege that that the Follow Up Article misleadingly portrayed the individuals who

United States District Court
Northern District of California

vouched for Buttar's integrity in the Open Letter as "Mr. Buttar's friends, when they are fiercely independent political activists." Compl. ¶ 42. This allegation is belied by the text of the Follow Up Article. Defendant identified signatories of the Open Letter as "several progressive activists in the Washington area, where Buttar used to live," and identified a particular signer, "Code Pink cofounder Medea Benjamin, a well-known former Bay Area activist who now lives in the Washington area." Follow Up Article at 1. It quotes and identifies additional individuals who spoke in support of Buttar, including "Polly Miller, who worked with Buttar on an anti-police-brutality campaign several years ago," and "Pat Elder, a longtime activist and journalist who has worked with Buttar on a half-dozen wealth inequality and antiwar campaigns." *Id.* at 3-4. Thus, there is no substantial basis to Plaintiffs' assertion that Defendant falsely portrayed the identities and backgrounds of those who expressed support for Buttar.

Second, Plaintiffs allege that the Follow Up Article was misleading because, although it reported on the Open Letter, it did not explain that the Open Letter included allegations that "Croydon had a long history of false accusation against political activists" nor did it otherwise "disclose that highly relevant history to *Chronicle* readers." Compl. ¶ 43. Again, the Court is skeptical of Plaintiffs' position that the alleged omissions of allegations against Croydon in unrelated incidents demonstrate that the Follow Up Article reported anything that was provable as false. However, Plaintiffs are correct that the Open Letter did include a section which argues that Croydon (referred to as a "trouble individual") has a "long history of fabricating attacks against innocent people" and is "an individual with a widely known pattern of marking false accusations." Ibarguen Decl., Exh. H ("Open Letter"). The Follow Up Article's summary of the contents of the Open Letter did not include this context. Plaintiffs arguably alleged enough to plead falsity in Defendant's omission in the Follow Up Article of a reference to public allegations attacking Croydon's credibility. However, it is unclear whether this alleged omission is enough to show that "the substance, the gist, the sting, of the libelous charge [is] justified," Masson, 501 U.S. at 517, when considered in context with the Follow Up Article's reporting on Buttar's denial of Croydon's allegations and quotations from several activists who vouched for Buttar's character and integrity.

1     Nonetheless, even assuming arguendo that Plaintiffs plausibly alleged falsity, Plaintiffs'

2 defamation claim still fails because they have not plausibly plead actual malice.

3     3.   <u>Actual Malice</u>

4     Plaintiffs fail to plausibly allege facts to show a likelihood that it can satisfy the "clear and

5 convincing" standard to prove actual malice. To do so, Plaintiffs are required to allege facts

6 showing that the Defendant "entertained serious doubts as to the truth of the publication." *Sipple*,

7 71 Cal. App. 4th at 248. The only facts Plaintiffs plead to support their actual malice burden boils

8 down to (a) failure by Hearst to contact some individuals identified by Plaintiffs who, according to

9 Plaintiffs, believed Croydon –based on unrelated conduct–to be untrustworthy, and (b) Hearst's

10 failure to include those individuals' views about or other public attacks on the character and

11 credibility of Croydon. Compl. ¶¶ 58, 59. These allegations are insufficient, as a matter of law, to

12 satisfy Plaintiffs' burden of proving actual malice.

13     As an initial matter, Defendant's editorial decisions as to process and choice of material to

14 include in a news clip is constitutionally protected; disagreement with that process, without more,

15 does not give rise to a claim for defamation. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241,

16 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to

17 limitations on the size and content of the paper, and treatment of public issues and public

18 officials—whether fair or unfair—constitute the exercise of editorial control and judgment.").

19     There are more specific reasons why actual malice has not been demonstrated. First,

20 Plaintiffs do not plead actual malice by relying on a purported failure to contact certain individuals

21 who, based on the facts pled in the Complaint, lacked any specific or actual knowledge that

22 Croydon's allegations against Buttar were false. Though the Complaint alleges that these

23 individuals subjectively believed – based on their own interactions with her or with Buttar – that

24 Croydon's allegations were not credible, the Complaint fails to allege any facts indicating that

25 these individuals (or anyone else not contacted by Hearst) could offer actual knowledge that the

26 specific allegations against Buttar were false. And certainly there is no allegation that Defendant

27 knew that these individuals had actual knowledge.

28     Second, Defendant's alleged failure to investigate by contacting preferred sources

14

United States District Court
Northern District of California

1    proposed by Plaintiffs is insufficient to demonstrate the articles at issue were published with

2    *knowledge* of their falsity or reckless disregard for their truth.  *Reader's Digest*, 37 Cal. 3d at 247

3    ("The failure to conduct a thorough and objective investigation, standing alone, does not prove

4    actual malice, nor even necessarily raise a triable issue of fact on that controversy"); *see also*

5    *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate

6    before publishing, even when a reasonably prudent person would have done so, is not sufficient to

7    establish reckless disregard"); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless

8    conduct is not measured by whether a reasonably prudent man would have published, or would

9    have investigated before publishing.  There must be sufficient evidence to permit the conclusion

10   that the defendant in fact entertained serious doubts as to the truth of his publication.").  Here,

11   there is nothing alleged that would rise above, *e.g.*, negligence.  Again, nothing in the Open Letter

12   or any other source indicated that any potential source has firsthand knowledge of Croydon's

13   allegations against Buttar and thus were particularly credible.

14   Third, Plaintiffs' allegations of deficient reporting stem from an email Buttar's campaign

15   representative sent to the *Chronicle* reporter *after* the First Article was already published, and,

16   thus, cannot serve as a basis for finding actual malice in the publication of the First Article.  *See*

17   Email Correspondence at 6 (ten minutes after First Article was published, offering to connect the

18   newspaper with "some people who can speak about [Mr. Buttar's] character and other claims [Ms.

19   Croydon] has made in the past that are false – including one who alleges that she also made false

20   claims about her husband.  Would you want to speak with them?  We are reluctant to attack her

21   character out of respect to survivors . . . but they are willing to speak with you.").

22   Plaintiffs' citation to the California Supreme Court's decision in *Khawar v. Globe Int'l,*

23   *Inc.*, 19 Cal. 4th 254, 277 (1998) is so far afield from the facts here that it does not affect, let alone

24   alter, the analysis.  That case concerned the 1989 re-publication of accusations initially published

25   in a book which sold just 500 copies that the plaintiff assassinated Senator Robert F. Kennedy

26   twenty-one years earlier in 1968.  *Id.* at 259, 266.  The court explained that the jury's actual malice

27   finding was supported by evidence of the extraordinary circumstances of the situation which

28   clearly raised reasons to doubt the accuracy of the accusation:

1
2
3
4
5
6
7
8
9
10
11
12
13

> There were, to say the least, obvious reasons to doubt the accuracy of the. . . accusation that Khawar killed Kennedy.  The assassination of a nationally prominent politician, in the midst of his campaign for his party's nomination for the presidency, had been painstakingly and exhaustively investigated by both the FBI and state prosecutorial agencies.  During this massive investigation, these agencies accumulated a vast quantity of evidence pointing to the guilt of Sirhan as the lone assassin.  As a result, Sirhan alone was charged with Kennedy's murder. . . The jury returned a verdict finding beyond a reasonable doubt that Sirhan was guilty of first degree murder.  On Sirhan's appeal from the resulting judgment of death, this court carefully reviewed the evidence and found it sufficient to sustain the first degree murder conviction.  In asserting that Khawar, not Sirhan, had killed Kennedy, the [book] was making the highly improbable claim that results of the official investigation, Sirhan's trial, and this court's decision on Sirhan's appeal, were all fundamentally mistaken.  Because there were obvious reasons to the doubt the accuracy of the [book's] central claim. . . the jury could properly conclude that Globe acted with actual malice in republishing that claim if it found also, as it impliedly did, that Globe failed to use readily available means to verify the accuracy of the claim by interviewing obvious witnesses who could have confirmed or disproved the allegations or by inspecting relevant documents or other evidence.

14  *Id.* at 276 (internal citations omitted).  The Court further noted that "this was not a situation in

15  which time pressures made it impossible of impractical to investigate the truth of the accusation,"

16  given that the accusation was published 21 years after the assassination when it "had long ceased

17  to be an issue that urgently engaged the public's attention."  *Id.* at 277.  In light of these

18  circumstances, the Court explained, "Before publishing an article accusing a private figure of a

19  sensational murder, Globe could well have afforded to take the time necessary to investigate with

20  sufficient thoroughness to form an independent judgment before republishing an accusation likely

21  to have a devastating effect on the reputation of the person accused."  *Id.*

22       The facts of *Khawar* are fundamentally dissimilar from the allegations here where

23  Defendant published breaking news about allegations regarding a public figure, sought comment

24  from the accused, repeatedly published the accused's denial of the allegations, and additionally

25  published the views of others who vouched for the accused and supported his denial.  Plaintiffs

26  omit all of the relevant factual context underlying the analysis in *Khawar* and, instead, cherry-pick

27  the final sentence quoted above to imply that the high standard for actual malice is satisfied

28  *whenever* a publisher does not sufficiently investigate a serious accusation against the accused.

United States District Court
Northern District of California

Opp. at 10-11.  *Khawar* did not announce such a rule.  Instead, *Khawar* explained that a finding of actual malice *may* be upheld "'where there are *obvious reasons* to doubt the veracity of the informant or the accuracy of his reports', and the republisher failed to interview obvious witnesses who could have confirmed or disproved the allegations or to consult relevant documentary sources."  *Id.* (quoting *Harte-Hanks*, 491 U.S. at 682-84) (emphasis added).

As the Court of Appeal noted in *Widener v. Pac. Gas & Elec. Co.*, 75 Cal. App. 3d 415, 434 (Ct. App. 1977), actual malice "involves a stringent and subjective standard. It is not measured by whether a reasonably prudent person would have published, or would have investigated before publishing.  Rather, there must be sufficient evidence to permit an inference that the defendant must have, in fact, subjectively entertained serious doubts as to the truth of his statement."  (Citation omitted.)

For the reasons stated above, there were no "*obvious* reasons to doubt the veracity of" Croydon.  Nor is there any allegation of a failure to "interview obvious witnesses who could have confirmed or disproved the allegations."  *Id.*  Defendant did not rely on sources "*known* to be unreliable," so as to prove evidence that "publisher himself had serious doubts regarding the trust of his publication."  *Reader's Digest*, 37 Cal.3d at 258 (emphasis added).

Finally, Plaintiffs plead no facts *whatsoever* in support of their conclusory allegation that Defendant maliciously published false information based on its motive to discriminate against Plaintiff Buttar for being "an immigrant Muslim."  FAC ¶ 47.

Plaintiffs' defamation claim fails because Plaintiffs do not plausibly allege actual malice.

4.    Compliance with Cal Civ. Code § 48a

Defendant argues a third ground for dismissal of the defamation claim: Plaintiffs' fail to adhere to the requirements of California's correction statute, Cal. Civ. Code § 48a, requiring a libel plaintiff seeking to recover general damages from a publisher to serve written notice to the publisher within 20 days of knowledge of the publication, specifying the allegedly libelous statements and demanding correction.  Cal. Civ. Code § 48a(a) ("In any action for damages for the publication of a libel in a daily or weekly news publication, or of a slander by radio broadcast, plaintiff shall only recover special damages unless a correction is demanded and is not published

or broadcast, as provided in this section."); Mot. at 24-27.  Failure to serve such a specific and timely demand of correction limits a plaintiff's recovery, as a matter of law, to recovery of special damages.  *Id.*  Special damages are defined in the statute as "damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other."  Cal. Civ. Code § 48a(d)(2); *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013) (noting that special damages are actual out-of-pocket losses and must be pled with specificity).  Where a plaintiff fails to serve a correction demand and also fails to adequately plead special damages, the claims fail on their face and must be stricken under the anti-SLAPP statute.  *Anschutz Ent. Grp. v. Snepp*, 171 Cal. App. 4th 598, 643 (2009) (dismissing defamation claims under anti-SLAPP where no legally enforceable correction demand was served by the plaintiff and where special damages were pled only through generalized allegations of indeterminate damages and plaintiff "presented no proof of special damages").

Plaintiffs here have neither plead facts demonstrating compliance with the notice requirement of § 48a(a), nor has Plaintiff plead facts sufficient to justify special damages.  The Complaint fails to identify any direct communication between Buttar and Defendant Hearst, the publisher, in connection with its reporting on this issue that constitutes a "written notice specifying the statements claimed to be libelous and demanding that those statements be corrected."  Cal. Civ. Code § 48a(a).  The only communication Plaintiffs allege was sent to Hearst after publication of its July 21 Article that *might* have satisfied this requirement is the email sent by a campaign representative to reporter Garofoli at 5:44am on July 22.  But, based on Plaintiffs' own description, that message was sent directly to a reporter (not the publisher, as required by § 48a), and "requested that the *Chronicle* correct the Original Piece by, *inter alia*, interviewing individuals 'closer to this situation' (such as Dr. Flowers or Ms. Zundmanis)."  Compl. ¶ 30. That communication failed to demand any correction of Hearst's First Article consistent with the requirements of Cal. Civ. Code § 48a.  Instead, it sought additional, follow-up coverage of the matter in the form of interviews with third parties representing "'a number of voices' [that] had

1  therefore barred from recovering general damages.  And, Plaintiffs have also failed to plead

2  special damages with sufficient specific to plausibly allege an entitlement to special damages.

3          5.      Conclusion re: Sufficiency of Defamation Claim

4          As explained above, Plaintiffs fail to state a claim of defamation because (1) they do not

5  plausibly allege actual malice, and (2) they fail to plead compliance with Cal. Civ. Code § 48a or

6  facts sufficient to support claims for special damages and thus are not entitled to any recovery.

7  Accordingly, Plaintiffs' defamation claim is insufficient as a matter of law.  Therefore, Plaintiffs

8  fail to satisfy their burden under California' anti-SLAPP statute to show a likelihood of success on

9  the merits of their defamation claim, and, thus, Plaintiff's complaint is dismissed.[3]

10 C.     Leave to Amend

11         Defendant requests that the complaint be stricken and dismissed with prejudice under

12 California' anti-SLAPP statutes, and that the Court find that Defendant is entitled to an award of

13 fees and costs under the anti-SLAPP statute.  Cal. Civ. Proc. Code § 425.16(c)(1).  Plaintiffs,

14 however, request leave to amend their complaint–their first complaint–and note the Ninth Circuit

15 has observed that "granting a defendant's anti-SLAPP motion to strike a plaintiff's initial

16 complaint without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P.

17 15(a)'s policy favoring liberal amendment." *Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377

18 F.3d 1081, 1091 (9th Cir. 2004); *see also id*. ("If the offending claims remain in the first *amended*

19 complaint, the anti-SLAPP remedies remain available to defendants.") (emphasis added).  Thus,

20 although it appears unlikely that that Plaintiffs will be able to cure the deficiencies in their

21 complaint, in light of the Ninth Circuit's holding that a Plaintiff in federal court be granted leave

22 to amend their initial complaint before it is dismissed with prejudice under a state law anti-SLAPP

23 statute, the Court grants Plaintiffs leave to amend and withholds ruling that the Defendants are

24 entitled to fees under the anti-SLAPP statute at this juncture.  *See Sanchez v. Law Office of Armo*,

25 No. 1:20-cv-00163-NONE-SKO, 2021 WL 1214559, at *17-18 (E.D. Cal. Mar. 31, 2021) ("Since

26 Defendants' anti-SLAPP motion is being considered in federal court, and since the Ninth Circuit

27

28 [3] Plaintiffs do not dispute that their claim under California's unfair competition law is derivative
   of their defamation claim.  Because their defamation claim fails, so too does their UCL claim.

United States District Court
Northern District of California

requires that plaintiff be given an opportunity to amend her complaint, the granting in part of Defendants' motion is considered a 'technical' victory that does not warrant an award of attorney's fees to Defendant as the prevailing party.") (citing *Verizon*, 377 F.3d at 1091).  The Court notes, however, for the reasons explained above, it would be futile for Plaintiffs to amend their complaint to a state a claim for defamation stemming from the First Article.  Thus, to the extent Plaintiffs' claims stem from the First Article, the claims are dismissed with prejudice.

## V.    CONCLUSION

The Court **GRANTS** Defendant's motion to dismiss.  Docket No. 27.  Although it is unclear whether Plaintiffs can cure the deficiencies in their complaint, Plaintiffs are granted leave to amend with regards to their claims stemming from the Follow Up Article.  Plaintiffs' amended complaint must be filed within thirty (30) days from the date of this order.

This order disposes of Docket No. 27.

**IT IS SO ORDERED**.

Dated: April 25, 2022

_____
EDWARD M. CHEN
United States District Judge