GAUTAM DUTTA (State Bar No. 199326)
BUSINESS, ENERGY, AND ELECTION LAW, PC
1017 El Camino Real # 504
Redwood City, CA  94063
Telephone:  415.236.2048
Email:  Dutta@BEELawFirm.com
Fax:  213.405.2416

Attorneys for Plaintiffs
SHAHID BUTTAR FOR CONGRESS COMMITTEE and
SHAHID BUTTAR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHID BUTTAR FOR CONGRESS COMMITTEE and SHAHID BUTTAR, an individual;<br><br>*Plaintiffs*,<br><br>vs.<br><br>HEARST COMMUNICATIONS, INC., a Delaware corporation; and DOES 1 through 5;<br><br>*Defendants*. | CASE NO. 3:21-cv-05566-EMC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF**<br><br>JURY TRIAL DEMANDED<br><br>1.  Defamation at Common Law and Cal. Civ. Code §45 (Libel)<br><br>2.  Violation of Cal. Bus. & Prof. Code §§17200, et seq.<br><br>JUDGE:  Hon. Edward M. Chen |

**INTRODUCTION**

1.      The First Amendment exists to protect legitimate journalism, not racist character assassination in the service of a public assault on election integrity and democratic accountability.  The First Amendment is supposed to protect democracy, not invite its subversion.

2.      This lawsuit aims to vindicate the fundamental right of everyone, especially people from marginalized and vulnerable communities, to run for political office on the

FIRST AMENDED COMPLAINT

1        basis of the content of their character – without having their reputations harmed

2        due to reckless, unethical reporting by newspapers of record.

3      3.     On July 21, 2020, the San Francisco *Chronicle* published an article containing a

4        false allegation that Congressional candidate Shahid Buttar had committed sexual

5        harassment.

6      4.     At the time, Mr. Buttar was the first Democrat to challenge U.S. House of

7        Representatives Speaker Nancy Pelosi in a general election.

8      5.     As a direct result of the *Chronicle*'s publication of the false allegation, Mr. Buttar

9        and his campaign were inflicted with grievous harm to their reputations.

10       Furthermore, the *Chronicle*'s amplification of the false allegations likely deterred a

11      significant number of voters in California's 12th Congressional District from

12      voting for Mr. Buttar.

13                        **THE PARTIES**[1]

14      6.     Defendant **Hearst Communications, Inc.** ("Defendant Hearst"), a Delaware

15      corporation, owns the San Francisco *Chronicle*, which is located at 901 Mission

16      St., San Francisco, CA  94103.  The *Chronicle* is the newspaper of record for the

17      12th Congressional District, which covers most of the City and County of San

18      Francisco.

19      7.     Defendant Hearst and the Bay Area News Group (which owns the *Mercury News*

20      and East Bay *Times*) comprise the two media conglomerates that own the only

21      newspapers of record in the Bay Area.

22      8.     Plaintiff **Shahid Buttar** is a constitutional lawyer, legal advocate, nonprofit leader,

23      community organizer, poet, and musician.

24      9.     An early advocate for LGBTQ marriage equality and a longtime advocate for civil

---

[1]    Plaintiffs do not know the true names and capacities of Defendants sued in this Complaint as Does 1 through 5, and therefore sues those Defendants by fictitious names.  Plaintiffs will amend this Complaint to allege the true names and capacities of Does 1 through 5 as soon as they have been ascertained.  Upon information and belief, each of the Defendants named as Does 1 through 5 is responsible in some manner for the occurrence, injury, and other damages alleged in this Complaint.

    FIRST AMENDED COMPLAINT

1    liberties, Mr. Buttar worked over the previous 15 years for nonprofit organizations

2    including the Electronic Frontier Foundation (EFF), Bill of Rights Defense

3    Committee (now known as Defending Rights and Dissent), Muslim Advocates,

4    and the American Constitution Society (ACS).

5    10.    In 2020, Mr. Buttar and House Speaker Pelosi were the only two candidates to

6    qualify for the Nov. 3, 2020 general election for California's 12th Congressional

7    District.

8    11.    A British immigrant of Pakistani descent, Mr. Buttar grew up in the Midwest.  He

9    first came to the Bay Area in 2000 to study law at Stanford Law School, from

10   which he received his law degree in 2003.

11   12.    To date, no immigrant, Muslim, or person of color like Mr. Buttar has represented

12   California's 12th Congressional District.

13   13.    Mr. Buttar ran again as a candidate in the 2022 Congressional election, but did not

14   qualify for the Nov. 8, 2022 general election.

15   14.    Plaintiff **Shahid Buttar for Congress Committee** ("Buttar for Congress" or

16   "campaign"), an unincorporated organization headquartered in San Francisco,

17   constituted Mr. Buttar's Congressional campaign for the 2020 Congressional

18   election, and constituted Mr. Buttar's campaign for the 2022 Congressional

19   election.

20                        **JURISDICTION AND VENUE**

21   15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332 (diversity

22   jurisdiction).  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391,

23   for Defendant Hearst, in its capacity as owner of the *Chronicle*, is subject to

24   personal jurisdiction in this judicial district.

25                  **THE DEFAMATORY *CHRONICLE* ARTICLE**

26   16.    *The Chronicle's Original Piece.*  On **July 22, 2020,** the *Chronicle* published an

27   article (the "Original Piece") in its print edition under the headline, "Shahid Buttar,

28

- 3 -                    FIRST AMENDED COMPLAINT

1    Nancy Pelosi's Election Opponent, Accused of Sex Harassment".[2] *Chronicle*

2    reporter Joe Garofoli wrote the Original Piece.

3    17.    The Original Piece was based on a self-published *Medium* post in which a former

4            acquaintance (Elizabeth Croydon) alleged that Mr. Buttar had sexually harassed

5            her.[3]

6    18.    The previous afternoon (**July 21, 2020**), *Chronicle* reporter Joe Garofoli

7            demanded that Buttar for Congress provide a response to Ms. Croydon's

8            allegations in less than two hours.

9    19.    Within two hours, Buttar for Congress promptly emailed Mr. Garofoli a statement

10           from Mr. Buttar that denied Ms. Croydon's claims.

11   20.    Based on the text of the Original Piece, it does not appear that Mr. Garofoli

12           interviewed Ms. Croydon before the Original Piece was published.

13   21.    In other words, the *Chronicle* published the Original Piece – even though its

14           reporter had interviewed *neither* Ms. Croydon *nor* Mr. Buttar regarding Ms.

15           Croydon's allegations against Mr. Buttar.

16   22.    *Buttar for Congress Notifies the* Chronicle *of Ms. Croydon's Prior False Claims.*

17           In an email sent at 8:30 pm that same evening,[4] Buttar for Congress representative

18           Patricia Brooks notified Mr. Garofoli that Ms. Croydon had not only made a false

19           claim about Mr. Buttar, but had made false claims about the husband of another

20           person:

21                   We do have some people who can speak about [Mr. Buttar's] character and
22                   other claims [Ms. Croydon] has made in the past that are *false* – including
                     one who alleges that she also made *false claims about her husband*.  Would
23                   you want to speak with them?  We are reluctant to attack her character out

---

24   [2]    Joe Garofoli, "Shahid Buttar, Nancy Pelosi's Election Opponent, Accused of Sex

25   Harassment", San Francisco *Chronicle*, July 22, 2020, at B4, online version *available at*
     https://www.sfchronicle.com/politics/article/Shahid-Buttar-Nancy-Pelosi-s-election-

26   15424675.php (last visited July 17, 2021).

     [3]    Elizabeth Croyden, self-published *Medium* post, July 21, 2020, *available at*

27   https://medium.com/@elizabethcroydon/shahid-buttar-repeatedly-sexually-harassed-me-
     1a23f22924dd (last visited July 17, 2021).

28   [4]    All times reflect Pacific Standard Time (PST).

FIRST AMENDED COMPLAINT

of respect to survivors … but *they are willing to speak with you*."[5]

23.   Ms. Brooks offered to put Mr. Garofoli in touch with those individuals – including one person (Dr. Margaret Flowers, M.D.) who alleged that Ms. Croydon had made false claims about her husband.

24.   However, Mr. Garofoli chose not to interview *any* of those individuals, including Dr. Margaret Flowers, M.D. and Martine Zundmanis.

25.   Dr. Flowers and Ms. Zundmanis knew both Mr. Buttar and Ms. Croydon during the 2000s, the period when Ms. Croydon alleged that Mr. Buttar had purportedly harassed her.

26.   According to Dr. Flowers, Ms. Croydon falsely accused Dr. Flowers' husband Kevin Zeese of sexual assault in 2006, the same year he was a Maryland candidate for the U.S. Senate.

27.   According to Ms. Zundmanis, there is no merit to Ms. Croydon's allegations regarding Mr. Buttar.  Ms. Zundmanis has observed previous instances where Ms. Croydon false accused progressive political activists of sexual harassment – including an activist who worked at a prominent environmental organization and suffered grave harm as a result.

28.   *The Bay Area Reporter Article Discussing Ms. Croydon's Credibility.*  That same evening (**July 21, 2020**), the *Bay Area Reporter* – which interviewed both Dr. Flowers and Ms. Zundmanis – published an article (the "B.A.R. article")[6] that included their accounts regarding Ms. Croydon's claims.

29.   In relevant part, the B.A.R. article stated:

> Two women who knew Buttar in the 2000s told the *B.A.R.* that there was *no credibility* to what Croydon alleges occurred.  Martine Zundmanis, who met Buttar in 2004 while working together on civil rights issues, said there is "absolutely no merit" to Croydon's claims.

---

[5]   Italics added.

[6]   Matthew S. Bajko, "Political Notebook:  Pelosi Challenger Buttar Accused of Sexual Harassment, Misogyny", *Bay Area Reporter*, July 21, 2020, *available at* https://www.ebar.com/news/latest_news/295177 (last visited July 17, 2021).

FIRST AMENDED COMPLAINT

1

2
> "I think in context of the progress victims and survivors have made as a
> result of the #MeToo movement, to have someone as ethical and with so
> much integrity as Shahid to be attacked with *lies* like this is just
> disgusting," she said.

3

4

5
> Dr. Margaret Flowers, on Twitter and in a phone interview with the
> B.A.R., said Croydon had *falsely accused* her partner, attorney Kevin
> Zeese, of *sexual assault* in 2006.  "It is really sad she is given any
> credibility," said Flowers.  "I have known Shahid for at least a decade; I
> have a lot of respect for him."[7]

6

7

8      30.    At 5:44 am the next morning (**July 22, 2020**), Buttar for Congress' Patricia Brooks

9             sent an email to the *Chronicle*'s Joe Garofoli.

10     31.    In her email, Ms. Brooks again stated that (1) Ms. Croydon's allegations about Mr.

11            Buttar were false, and (2) "a number of voices" had been "left out" from the

12            *Chronicle*'s story.  To that end, Ms. Brooks requested that the *Chronicle* correct

13            the Original Piece by, *inter alia*, interviewing individuals "closer to this situation"

14            (such as Dr. Flowers or Ms. Zundmanis).

15     32.    In response, the *Chronicle* failed to correct or otherwise revise the Original Piece.

16            Instead, in a **July 22, 2020** email, Mr. Garofoli invited Ms. Brooks to submit an

17            opinion (op-ed) piece to the *Chronicle*.  At the time, the *Chronicle*'s opinions

18            editor was John Diaz.

19     33.    Within a matter of hours, Buttar for Congress submitted an opinion piece (the

20            "Opinion Piece") to the *Chronicle*.  Specifically, Ms. Brooks responded to Mr.

21            Garofoli's July 22, 2020 email and added Mr. Diaz to the recipient list.

22     34.    In response, Mr. Diaz sent Ms. Brooks an email on July 23,2020.  In that email,

23            Mr. Diaz refused to publish the Opinion Piece in the interest of "fairness".

24     35.    Upon information and belief, Mr. Diaz was authorized to receive correction

25            requests on behalf of the *Chronicle*'s publisher; alternatively, the *Chronicle*'s

26            publisher had actual knowledge of Ms. Brooks' July 22, 2020 correction request

27

28     ---
       [7]   *Id.* (italics added).

FIRST AMENDED COMPLAINT

within 20 days of her request.[8]

36.   *Author Chris Sampson's Email to the* <u>Chronicle</u> *regarding Ms. Croydon's Credibility.*  The next day (**July 23, 2020**) at 4:22 pm, Mr. Garofoli and two other *Chronicle* employees received an email from Chris Sampson, a national security expert.

37.   In that email, Mr. Sampson stated that Ms. Croydon was a "pathological liar" who had "harassed" one of his friends "repeatedly in private texts to the point of [his] friend considering suicide."

38.   Mr. Sampson further stated that he had "no association" with Mr. Buttar and had "never talked with him."  Mr. Sampson also stated that he contacted Buttar for Congress when he "saw [Ms. Croydon's] accusation".

39.   Mr. Sampson ended his email by expressing his disappointment with the *Chronicle*:

> You had a duty to tell the readers the truth.
>
> You should do a better job in the future or consider your reputation destroyed.

**OTHER PUBLISHED ARTICLES EXAMINING MS. CROYDON'S CREDIBILITY**

40.   On **July 23, 2020,** the day after the Original Piece was published, the *Intercept* covered Ms. Croydon's allegations.  Significantly, the *Intercept* expressly stated that a number of individuals had questioned Ms. Croydon's credibility:  "The *Intercept* has spoken to several people who recounted having disturbing interactions with Croydon that caused them to question her credibility."[9]

41.   *The Open Letter Regarding Ms. Croydon's Credibility.*  The next day (**July 24, 2020**), the *Independent Political Report* published an open letter (the "Open Letter"), in which 17 individuals (including Dr. Flowers and Ms. Zundmanis)

---

[8]   *See Freedom Newspapers, Inc. v. Superior Court*, 4 Cal.4th 652, 658 (Cal. 1992).

[9]   Akela Lacy, *Intercept*, July 23, 2020 "Shahid Buttar's Bid to Unseat Nancy Pelosi Roiled by Staff Mistreatment", *available at* https://theintercept.com/2020/07/23/shahid-buttar-campaign-allegations/ (last visited July 17, 2021).

FIRST AMENDED COMPLAINT

expressed deep concern regarding Ms. Croydon's credibility and described her

history of false allegations against political activists:

> The accuser [Ms. Croydon] is well known in the D.C. social-justice community.  Unfortunately, this troubled individual has a long history of fabricating attacks against innocent people.  A review of litigation she has filed in various jurisdictions would likely yield a revealing picture to an enterprising journalist.  She has engaged in *late-night phone harassment campaigns, false allegations, and physical threats* against numerous individuals over the years.  She is NOT a credible witness against this promising progressive leader."[10]

42.    Two months later (**Sept. 25, 2020**), after conducting a follow-up investigation, the *Intercept* delivered a definitive, sobering conclusion regarding Ms. Croydon's allegations about Mr. Buttar:  "Yet Croydon's claims *have not been borne out*. The Intercept was **not** *able to corroborate Croydon's allegations* and has interviewed multiple sources who recounted having disturbing interactions with her that *caused them to question her credibility*."[11]

43.    The *Intercept*'s Sept. 25, 2020 findings prompted it to update its original, July 23, 2020 article.  Specifically, the *Intercept* placed an "editor's note" in a prominent position at the top of the article text.[12]

**THE <u>CHRONICLE</u>'S SECOND PIECE ON MS. CROYDON'S ALLEGATIONS**

44.    On **July 25, 2020**, the *Chronicle* published a follow-up piece (the "Follow-Up Piece"), also written by Mr. Garofoli, regarding Ms. Croydon's allegations.

45.    Although it quoted individuals who defended Mr. Buttar's ethics and integrity, the Follow-Up Piece was reckless and malicious in two major ways.  *First*, it portrayed those individuals as Mr. Buttar's friends, when they are fiercely

---

[10]    "DC Activists Support Shahid Buttar, Call Accuser Troubled Person with History of Accusations" (italics added), *Independent Political Report*, July 24, 2020, *available at* https://independentpoliticalreport.com/2020/07/dc-activists-support-shahid-buttar-call-accuser-troubled-person-with-history-of-false-accusations/ (last visited July 17, 2021).

[11]    Akela Lacy, *Intercept*, Sept. 25, 2020, "Progressives wrestle with how to address allegations of mistreatment in San Francisco race", *available at* https://theintercept.com/2020/09/25/shahid-buttar-dsa-san-francisco-allegations/ (last visited July 18, 2021) (italics and bold print added).

[12]    *Id.*

FIRST AMENDED COMPLAINT

independent political activists.

46.     *Second*, the Follow-Up Piece failed to disclose that Ms. Croydon was not only a source known to be unreliable, but had a long history of hurling false accusations – including a false allegation of sexual assault – against political activists.

47.     The Follow-Up Piece thus deprived *Chronicle* readers of Ms. Croydon's history of hurling such false accusations, even though the July 23, 2020 *Intercept*, Mr. Sampson, and the 17 signatories of the Open Letter had laid bare obvious reasons to doubt Ms. Croydon's veracity.

48.     Mr. Garofoli had thus been apprised by Dr. Flowers, Ms. Zundmanis, other signatories of the Open Letter, and Mr. Sampson that Ms. Croydon had a long history of lobbing false accusations against political activists – including a false accusation that Kevin Zeese, a federal candidate had sexually assaulted Ms. Croydon.

49.     To make matters worse, the Follow-Up Piece *did not even provide a hyperlink* to the Open Letter.  As a result, *Chronicle* readers were deprived of the opportunity to decide for themselves whether the *Chronicle* had accurately reported the content of the Open Letter.

50.     In stark contrast, both the *Chronicle*'s Original Piece and Follow-Up Piece had provided hyperlinks to Ms. Croydon's false, self-published *Medium* allegations.

51.     In so doing, the *Chronicle* implied that Ms. Croydon's allegations were more credible than those of any of the 17 signatories to the Open Letter.

## THE AFTERMATH

52.     The *Chronicle* has never published a piece like the Original Piece about a White male candidate for office.

53.     In the United States, Islam is one of the most stigmatized religions.  Only 42 percent of Americans have a favorable view of Islam, according to a 2021 Associated Press/Norc Center for Public Affairs Research poll.[13]

---

[13]     Associated Press, "Two decades after 9/11, Muslim Americans still fighting bias",

FIRST AMENDED COMPLAINT

54. Joe Biden and Pete Buttigieg, who are both White males, were both accused of sexual misconduct during their respective Presidential candidacies.  The *Chronicle* did not rush to publish any of those accusations.  Instead, the *Chronicle* demonstrated the care it owed its readers and the public at large.

55. Had Mr. Buttar been a White male such as Joe Biden or Pete Buttigieg, rather than an immigrant Muslim of Pakistani descent, the *Chronicle* would not have rushed to publish the Original Piece, let alone publish it.  Instead, the *Chronicle* would have thoroughly investigated whether or not Ms. Croydon's allegations were credible.

56. The *Chronicle*'s publication of the Original Piece delivered crippling blows to Mr. Buttar's insurgent campaign against House Speaker Pelosi, who defeated Mr. Buttar on Nov. 3, 2020; and played a role in Mr. Buttar's failure to qualify for the Nov. 8, 2022 Congressional general election.

57. Ms. Croydon's false accusations were immediately and consistently seized upon by critics across the political spectrum – including the so-called "K-Hive", an organized network of certain supporters of Vice President Kamala Harris.  To this day, voices associated with K-Hive continue to actively promote Ms. Croydon's false allegations that were amplified by the *Chronicle*'s Original Piece.

58. Indeed, taking the cue from San Francisco's only newspaper of record, local media outlets such as the San Francisco *Bay Guardian*, *48 Hills*, and *Mission Local* published their own stories that referenced Ms. Croydon's false allegations.

59. As a result, Mr. Buttar and Buttar for Congress suffered lasting, grievous harm. The false allegations in the Original Piece recklessly and unjustly smeared Mr. Buttar's ethics and integrity, harmed his professional livelihood and personal relationships, slashed his speaking and writing opportunities, and gravely damaged the public's perception of his fitness to hold political office.

---

*available at* https://apnews.com/article/September-11-Muslim-Americans-93f97dd9219c25371428f4268a2b33b4, Sept. 6, 2021 (last visited Aug. 12, 2022).

FIRST AMENDED COMPLAINT

60. Mr. Buttar's campaigns and legislative vision are animated by constitutional concerns about corporate corruption in Congress and unconstitutional Congressional deference to executive-branch abuses of human rights across the United States and the globe.

61. The grievous harm inflicted upon Mr. Buttar and Buttar for Congress set back each of those issues that he and his supporters had sought to address.  Because he was forced to respond to false, disingenuous smears amplified by San Francisco's only newspaper of record, Mr. Buttar was effectively deprived of the ability to speak publicly about two critical issues amidst a global pandemic and ominous wildfires: healthcare policy and climate justice.

62. The *Chronicle*'s publication of Ms. Croydon's false allegations misled voters in a federal election.  Against such a backdrop, the *Chronicle*'s defamation of Mr. Buttar undermined Mr. Buttar, the integrity of our elections, and our very democracy.

## DAMAGES

63. The repeated indulgence and publication of false harassment claims by a newspaper of record destroyed the plaintiff's campaign for public office, ended any possibility of future public service, foreclosed future opportunities to return to his well-established career of non-profit advocacy, and blocked a visionary public policy agenda that had previously attracted unprecedented support – all while both leveraging and reinforcing harmful racial and religious stereotypes.

64. *2020 Campaign*.  The most immediate damages were those sustained by the campaign.  The Original and Follow-Up Pieces were published at a time that would inflict maximum political damage, and were very successful in driving support away from the campaign at a crucial point in the election cycle.

65. When the *Chronicle* published the false accusations toward Mr. Buttar in July 2020, the campaign had raised approximately $1.2 million since its April 2019 launch for the 2020 campaign cycle.  Until that point, the campaign had achieved a

FIRST AMENDED COMPLAINT

quarter-over-quarter growth rate of 96%, reflecting historically unprecedented support from across the country that was poised—absent the *Chronicle*'s character assassination and the ensuing "civic lynching"[14] documented by the SF *Bayview*—to continue.  *See* Chart 1 below.

66.    Instead, the campaign's fundraising collapsed, quickly falling to roughly a third of its previous level, and then further.  It never recovered, despite the eventual revelations by other journalists of the fraud indulged (and never corrected) by the *Chronicle*.  *See* Chart 2 below.

67.    The *Chronicle*'s publication led to a proverbial run on the bank, as many donors sought refunds of their contributions and former staffers attempted to extract resources from the campaign.

68.    A comparison between the first and second weeks in July makes the impacts of the "civic lynching" documented by the SF Bayview—in which the *Chronicle* played a crucial enabling role—inescapably clear.  *See* Charts 3 and 4 below.

69.    A comparison between the two months preceding the *Chronicle*'s repeated acts of malice and recklessness, and the two that followed it, also makes clear the impacts of *Chronicle*'s defamation.  *See* Charts 5 and 6 below.

70.    The campaign never recovered from the *Chronicle*'s repeated publication of false accusations, suppression of the facts, evidence, and whistleblowers, an indulgence of partisan character assassination.  Over the remainder of the campaign cycle, it was forced to shed staff, largely suspend its field operation, and dedicate its few press opportunities to fending off lies rather than advocating for the climate justice, racial justice, and economic justice goals that animated the campaign and inspired tens of thousands of supporters across the country to invest in it.

---

[14]    Gloria Berry, "White Supremacy in San Francisco," San Francisco *Bayview*, Aug. 26, 2021, *available at https://sfbayview.com/2021/08/white-supremacy-in-san-francisco/* (last visited Aug. 11, 2022).

FIRST AMENDED COMPLAINT

71. As a result of the *Chronicle*'s defamation, all of the campaign's supporters were harmed, as well as each of the 81,000 San Franciscans who voted for change despite the *Chronicle*'s concerted efforts to undermine democratic accountability.

72. Based on its observed growth rate previous to the *Chronicle*'s defamatory publications, the 2020 campaign lost $2,048,673 in projected contributions.

73. Ultimately, the $1.6 million raised by the campaign over the 2019-20 campaign cycle was reduced to worthlessness. The *Chronicle*'s defamatory, reckless, and malicious publication was the proximate cause of that harm.

74. *2022 Campaign.* The campaign continued to endure harm from the *Chronicle*'s defamatory, reckless, and malicious publications through its conclusion in June 2022, when the plaintiff's political career ended with his loss in the primary election to a Republican challenger.

75. After becoming the first Democrat to win the top-two primary alongside the incumbent in 2020, the plaintiff's campaign could have been well-situated to grow.

76. Due to the *Chronicle*'s character assassination and refusal to ever publish any of the verifiable facts, Mr. Buttar and his campaign were effectively hobbled and never able to recover any of the momentum established previous to the *Chronicle*'s publications.

77. In June 2020—the last full month before the *Chronicle*'s reckless and malicious publication—the campaign raised $234,521. Even setting aside any possible growth from its established support base at that time, presuming the campaign had merely continued with a flat rate of growth, it would have raised $3,986,857 through the June 2022 primary election.

78. Hobbled by the *Chronicle*'s indulgence of partisan character assassination, the 2022 campaign instead raised only $188,140, enduring a loss of $3,798,717.

79. That calculation, however, ignores the campaign's previous expansion, which continued up until the *Chronicle* set off the racist feeding frenzy that brought it to a screeching halt.

FIRST AMENDED COMPLAINT

80.   Based on its previous 96% quarter-to-quarter growth rate, if the *Chronicle* had not published the defamatory articles, the campaign would have raised over $25 million—as much as the career incumbent who has held the seat since 1987—for the 2022 election cycle.

81.   *Lost Volunteer Time.*  Before the *Chronicle*'s defamation, the campaign mobilized more than 30 volunteers each week for up to 10 hours each.  Using 5 hours per volunteer per week as a conservative estimate, and estimating the value of their time based on the local $15 minimum wage, the value of their time was roughly $2,250 per week.

82.   The campaign's volunteer recruitment, retention, and management program effectively collapsed, leaving it with no more than a handful of volunteers heading into the 2020 general election.

83.   During the 2020 election, the value of their lost work over the ensuing 14 weeks amounted to $31,500.  Over the 2022 cycle, it amounted to $184,500.

84.   *The Harm Suffered by Mr. Buttar.*  In his individual capacity, Mr. Buttar suffered grave harm due to the *Chronicle*'s malice.

85.   First, the *Chronicle*'s smears ended the possibility of him returning to his non-profit legal advocacy career.  He has interviewed for several positions, including Executive Director roles akin to those he held before running for office, but the reputational damage of the character assassination has imposed a dramatic chilling effect on potential employers.

86.   Mr. Buttar previously earned $100,000 at the Electronic Frontier Foundation, which served as the basis for his campaign salary.  Having been 46 when he was smeared, he has lost 19 years of earnings capacity based on a 65-year retirement age.  The value of Mr. Buttar's lost earnings (ignoring potential salary growth or inflation) total $1.9 million.

87.   Mr. Buttar also suffered grievous emotional harm and suffering, was unable to sleep soundly for nearly a year, and was driven to seek therapy to recover.  The

FIRST AMENDED COMPLAINT

1   harm to his relationships was incalculable.  A friend of over 20 years whom he had

2   dated for nearly five years severed their friendship citing the *Chronicle* article.

3   Mr. Buttar had previously spoken at her wedding.

4   88.   A relationship in which Mr. Buttar was engaged at the time of the character

5   assassination fell apart due to the stress it imposed, and the nature of the

6   accusations indulged by the *Chronicle* foreclose the possibility of, for instance,

7   posting a dating profile on a public website.  A jury must be given the opportunity

8   to determine the value of the lost relationships and companionship that Mr. Buttar

9   has suffered as a result of the *Chronicle*'s defamation.

10   89.   Mr. Buttar has also suffered a tremendous loss of opportunities to publish and

11   speak publicly.  When he was smeared, he was a regular guest on progressive

12   news programs and increasingly a source cited by writers across the country, from

13   *Rolling Stone* to the *Intercept*.

14   90.   That all came to a screeching halt.  While both *Rolling Stone* and the *Intercept*

15   published further stories about the campaign, they were entirely about the

16   fraudulent subjects of the character assassination indulged by the *Chronicle*, rather

17   than the plaintiff's policy proposals or political vision.

18   91.   The *Chronicle*'s defamation ended the plaintiff's opportunity to be heard on issues

19   of vital public concern from climate chaos to public health, and from foreign

20   policy to domestic civil rights.  A jury must be given the opportunity to determine

21   the value of a public voice being silenced.

22   92.   As a creative person poised to publish works including poetry, music, and non-

23   fiction political analysis, the harm to the Mr. Buttar's public voice has been multi-

24   dimensional.  Attempts to secure a book contract have proven unsuccessful, and

25   the plaintiff's social media reach has collapsed.

26   93.   The effort to neutralize Mr. Shahid's voice proved remarkably effective, and the

27   *Chronicle* was its leading agent.

28

FIRST AMENDED COMPLAINT

1

**PROCEDURAL HISTORY**

2   94.   On Apr. 25, 2022, the Court issued an Order (ECF 39) that dismissed Plaintiffs'

3         Complaint, with leave to amend as to claims based on the Follow-Up Piece.

4         Pursuant to Ninth Circuit precedent, this First Amended Complaint repleads all

5         allegations from the Complaint. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467,

6         1474 (9th Cir. 1997).

7

**COUNT 1**

8

Defamation at Common Law and Cal. Civil Code §45 (Libel)

9

*Against Defendant Hearst Communications, Inc.*

10   95.   The foregoing allegations are hereby incorporated by reference.

11   96.   The *Chronicle* is liable for defamation per se, for it published Ms. Croydon's false

12        allegations that Mr. Buttar sexually harassed her.

13   97.   The *Chronicle* published Ms. Croydon's false allegations with actual malice, for it

14        (a) knew the falsity of Ms. Croydon's allegations, or (b) recklessly disregarded the

15        falsity of Ms. Croydon's allegations.

16   98.   After giving Buttar for Congress less than two hours to respond to Ms. Croydon's

17        false allegations, the *Chronicle* then failed to contact individuals like Dr. Flowers

18        and Ms. Zundmanis – even after it was told that those individuals would have

19        provided details of Ms. Croydon's history of lobbing false allegations (including

20        her claim that Dr. Flowers' husband had sexually assaulted her) against one federal

21        candidate and other political activists.

22   99.   Subsequently, even though Mr. Garofoli had been apprised by Dr. Flowers, Ms.

23        Zundmanis, over a dozen other signatories of the Open Letter, and Mr. Sampson

24        that Ms. Croydon had a long history of false accusations against political activists

25        (including Kevin Zeese, a federal candidate), the Follow-Up Piece did not disclose

26        that highly relevant history to *Chronicle* readers.

27   100.  The evidence of actual malice from the Follow-Up Piece may be imputed to the

28        Original Piece. *See Church of Scientology v. Dell Publishing Co.*, 362 F.Supp.

FIRST AMENDED COMPLAINT

767, 770 (N.D. Cal. 1973).

101. The *Chronicle* published Ms. Croydon's false allegations without justification or privilege.

102. Mr. Buttar and Buttar for Congress suffered lasting, grievous harm.  The false allegations in the Original Piece recklessly and unjustly smeared Mr. Buttar's ethics and integrity, harmed his professional livelihood, and gravely damaged the public's perception of his fitness to hold political office.  Each of those grave harms continue – and continue to erode election integrity – to this day.

103. As a direct and proximate result, Buttar for Congress and Mr. Buttar suffered grievous harm to their reputations.

**COUNT 2**

Violation of Cal. Bus. & Prof. Code §§17200, et seq.

*Against Defendant Hearst Communications, Inc.*

104. The foregoing allegations are hereby incorporated by reference.

105. The Unfair Competition Law ("UCL", Cal. Bus. & Prof. Code §§17200, et seq.) bans any unlawful, unfair, and fraudulent business acts and practices.

106. Defendant Hearst has violated, and continues to violate, the UCL by engaging in the following unlawful acts and practices:  maliciously defaming Buttar for Congress and Mr. Buttar in violation of California Civil Code section 45 and under common law.

107. Defendant Hearst has violated, and continues to violate, the UCL by engaging in the following unfair business acts and practices:

   A.     Engaging in malicious, defamatory conduct, which provides no benefit to competition, such that the personal and political reputations of candidates like Mr. Buttar have suffered grievous harm.

   B.     Engaging in malicious, defamatory conduct in violation of public policy as reflected in California Civil Code section 45.

108. Buttar for Congress and Mr. Buttar have no adequate remedy at law for the injuries

FIRST AMENDED COMPLAINT

1   they will continue to suffer as a result of Defendant Hearst's unlawful acts.

2   109.   Unless restrained by this Court, Defendant Hearst will continue to pursue its unfair

3   and unlawful conduct.

4   **REQUEST FOR RELIEF**

5   Buttar for Congress and Mr. Buttar ask the Court to grant them the following relief:

6   I.   Damages, including general and special damages, in an amount to be determined

7   at trial;[15]

8   II.   Prejudgment interest;

9   III.   An order requiring (a) the retraction of all Ms. Croydon's defamatory allegations

10   that were published in the *Chronicle*, and (b) a public apology from the *Chronicle*.

11   IV.   An injunction requiring Defendant Hearst to cease engaging in unfair competition;

12   V.   Costs and attorney's fees to the extent provided for by law; and

13   VI.   All other relief that the Court deems just and equitable.

14

15   DATED:  Aug. 12, 2022

16

17   BUSINESS, ENERGY, AND ELECTION

18   LAW, PC

19

20   By:  /s/ Gautam Dutta

21   GAUTAM DUTTA, ESQ.

22   Attorneys for Plaintiffs

23   SHAHID BUTTAR FOR CONGRESS

24   COMMITTEE and SHAHID BUTTAR

25

26

27

28

---

[15]   Buttar for Congress and Mr. Buttar reserve the right to seek punitive damages at the appropriate time.

FIRST AMENDED COMPLAINT

**Chart 1:**



Before the Chronicle's defamation (April 2019-June 2020)

**Chart 2:**



After the Chronicle's defamation (June 2020-June 2022)

**Chart 3:**



**Chart 4:**



**Chart 5:**



**Chart 6:**

