1   GAUTAM DUTTA (State Bar No. 199326)
    BUSINESS, ENERGY, AND ELECTION LAW, PC
2   1017 El Camino Real # 504
    Redwood City, CA  94063
3   Telephone:  415.236.2048
    Email:  Dutta@BEELawFirm.com
4   Fax:  213.405.2416

5   Attorneys for Plaintiffs
    SHAHID BUTTAR FOR CONGRESS COMMITTEE and
6   SHAHID BUTTAR

7

8                   UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  SHAHID BUTTAR FOR CONGRESS            CASE NO. 3:21-cv-05566-EMC
    COMMITTEE and SHAHID BUTTAR, an
12  individual;                          **PLAINTIFFS' OPPOSITION TO
                                             DEFENDANT'S MOTION TO
13              *Plaintiffs*,               DISMISS AND SPECIAL
                                             MOTION TO STRIKE**
14         vs.

15  HEARST COMMUNICATIONS, INC., a       Hearing Date:  Dec. 15, 2022, 1:30 pm
    Delaware corporation; and DOES 1
16  through 5;                           JUDGE: Hon. Edward M. Chen

17              *Defendants*.            COURTROOM:  5 – 17th Floor

18

19

20

21

22

23

24

25

26

27

28

POINTS AND AUTHORITIES

**I.    Introduction**

Defendant's Anti-SLAPP Motion and Motion to Dismiss must be denied, for Plaintiffs have alleged claims for Defamation (and an associated Unfair Competition Law violation) that must be allowed to move forward, as a matter of law.  In July 2020, the San Francisco *Chronicle* published two pieces that contained the false accusation that Congressional candidate Shahid Buttar had committed sexual harassment.

Disturbingly, the *Chronicle* rushed to publish those pieces without seeking to corroborate the accuser's claim, even though it had been warned of the accuser's lack of credibility.  Earlier, the accuser – whom a national security expert deemed to be a "pathological liar" – had falsely claimed that another political candidate had assaulted her.  Making matters worse, the *Chronicle* refused to disclose to its readers the serious doubts that had been raised regarding the accuser's credibility.  Because the *Chronicle* acted with actual malice, Mr. Buttar and his campaign have met their "minimal burden" by introducing sufficient facts to establish a prima facie case for defamation.[1]

**II.    Relevant Background[2]**

A.    Relevant Parties

Plaintiff **Shahid Buttar** is a constitutional lawyer, legal advocate, nonprofit leader, community organizer, poet, and musician.  A British immigrant of Pakistani descent, Mr. Buttar grew up in the Midwest.  He first came to the Bay Area in 2000 to study law at Stanford Law School, from which he received his law degree in 2003.

---

[1]    "In opposing an anti-SLAPP motion, a defamation plaintiff *need not establish malice by clear and convincing evidence*, the standard applicable at trial. Rather, the plaintiff must meet her *minimal burden* by introducing sufficient facts to establish a prima facie case of actual malice; in other words, to establish a reasonable probability that she can produce clear and convincing evidence showing that the statements were made with actual malice." *Young v. CBS Broadcasting, Inc.*, 212 Cal.App.4th 551, 563 (Cal.Ct.App. 2012) (italics added, citation omitted).

[2]    Plaintiffs derive all facts from their First Amended Complaint ("FAC") and matters of which judicial notice may be taken.  *See Planned Parenthood v. Center for Medical Progress*, 890 F.3d 828, 834-35 (9th Cir. 2018) (plaintiff need not proffer evidence in response to Anti-SLAPP motion filed in federal court).

OPPOSITION

1    An early advocate for LGBTQ marriage equality and a longtime advocate for civil

2    liberties, Mr. Buttar worked over the previous 15 years for nonprofit organizations including the

3    Electronic Frontier Foundation, Bill of Rights Defense Committee (now known as Defending

4    Rights and Dissent), Muslim Advocates, and the American Constitution Society.

5    In 2020, Mr. Buttar and House Speaker Pelosi were the only two candidates to qualify for

6    the Nov. 3, 2020 general election for California's 12th Congressional District.

7    To date, no immigrant, Muslim, or person of color like Mr. Buttar has represented the 12th

8    Congressional District.  Mr. Buttar ran again as a candidate in the 2022 Congressional primary

9    election, but did not qualify for the Nov. 8, 2022 general Congressional election.

10    Plaintiff **Shahid Buttar for Congress Committee** ("Buttar for Congress"), an

11    unincorporated organization headquartered in San Francisco, constituted Mr. Buttar's

12    Congressional campaign for the 2020 and 2022 Congressional elections.

13    Defendant **Hearst Communications, Inc.** ("Defendant Hearst"), a Delaware corporation,

14    owns the San Francisco *Chronicle*.  The *Chronicle* is the newspaper of record for the 12th

15    Congressional District, which covers most of the City and County of San Francisco.  Defendant

16    Hearst and the Bay Area News Group (which owns the *Mercury News* and East Bay *Times*)

17    comprise the two media conglomerates that own the only newspapers of record in the Bay Area.

18    Plaintiffs bring claims for Defamation at Common Law and under Civil Code ¶45 (Libel)

19    and associated claims under the Unfair Competition Law.  On Apr. 25, 2022, the Court issued an

20    Order (ECF 39) that dismissed Plaintiffs' Complaint, with leave to amend as to claims based on

21    the Follow-Up Piece.  Pursuant to Ninth Circuit precedent, this First Amended Complaint

22    repleads all allegations from the Complaint.[3]

23    B.    Relevant Facts

24    *The Chronicle's Original Piece.*  On **July 22, 2020,** the *Chronicle* published an article (the

25    "Original Piece") in its print edition, by reporter Joe Garofoli, under the headline, "Shahid Buttar,

26    Nancy Pelosi's Election Opponent, Accused of Sex Harassment".[4]  The Original Piece was based

27    _____

[3]    *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997).

28    [4]    FAC ¶16 & n.2.

OPPOSITION

on a self-published *Medium* post in which a former acquaintance (Elizabeth Croydon) alleged that Mr. Buttar had sexually harassed her.[5]

The previous afternoon (**July 21, 2020**), Mr. Garofoli had demanded that Buttar for Congress provide a response to Ms. Croydon's allegations in less than two hours.[6]  Within two hours, Buttar for Congress promptly emailed Mr. Garofoli a statement from Mr. Buttar that denied Ms. Croydon's claims.[7]  The *Chronicle* published the Original Piece – even though its reporter had interviewed *neither* Ms. Croydon *nor* Mr. Buttar regarding Ms. Croydon's allegations against Mr. Buttar.[8]

*Buttar for Congress Notifies the* <u>Chronicle</u> *of Ms. Croydon's Prior False Claims.*  In an email sent at 8:30 pm on July 21, 2020,[9] Buttar for Congress representative Patricia Brooks notified Mr. Garofoli that Ms. Croydon had not only made a false claim about Mr. Buttar, but had made false claims about the husband of another person:

> We do have some people who can speak about [Mr. Buttar's] character and other claims [Ms. Croydon] has made in the past that are *false* – including one who alleges that she also made *false claims about her husband*.  Would you want to speak with them?  We are reluctant to attack her character out of respect to survivors … but *they are willing to speak with you.*"[10]

Ms. Brooks offered to put Mr. Garofoli in touch with those individuals – including one person (Dr. Margaret Flowers, M.D.) who alleged that Ms. Croydon had made false claims about her husband.[11]  However, Mr. Garofoli chose not to interview *any* of those individuals, including Dr. Margaret Flowers, M.D. and Martine Zundmanis.[12]

Both Dr. Flowers and Ms. Zundmanis knew both Mr. Buttar and Ms. Croydon during the 2000s, the period when Ms. Croydon alleged that Mr. Buttar had purportedly harassed her.[13]

---

[5]     FAC ¶17.
[6]     FAC ¶18.
[7]     FAC ¶19.
[8]     FAC ¶21.
[9]     All times reflect Pacific Standard Time (PST).
[10]    FAC ¶22 (italics in original).
[11]    FAC ¶23.
[12]    FAC ¶24.
[13]    FAC ¶25.

OPPOSITION

1  According to Dr. Flowers, Ms. Croydon falsely accused Dr. Flowers' husband Kevin Zeese of

2  sexual assault in 2006:  the same year Mr. Zeese was a Maryland candidate for the U.S. Senate.[14]

3         According to Ms. Zundmanis, there is no merit to Ms. Croydon's allegations regarding

4  Mr. Buttar.  Ms. Zundmanis has observed previous instances where Ms. Croydon false accused

5  progressive political activists of sexual harassment – including an activist who worked at a

6  prominent environmental organization and suffered grave harm as a result.[15]

7         *The Bay Area Reporter Article Discussing Ms. Croydon's Credibility.*  That same evening

8  (**July 21, 2020**), the *Bay Area Reporter* – which interviewed both Dr. Flowers and Ms.

9  Zundmanis – published an article (the "B.A.R. article") that included their accounts regarding Ms.

10 Croydon's claims.[16]  In relevant part, the B.A.R. article stated:

11            Two women who knew Buttar in the 2000s told the *B.A.R.* that there was *no
12            credibility* to what Croydon alleges occurred.  Martine Zundmanis, who met Buttar
              in 2004 while working together on civil rights issues, said there is "absolutely no
13            merit" to Croydon's claims.

14            "I think in context of the progress victims and survivors have made as a result of
15            the #MeToo movement, to have someone as ethical and with so much integrity as
              Shahid to be attacked with *lies* like this is just disgusting," she said.

16
17            Dr. Margaret Flowers, on Twitter and in a phone interview with the B.A.R., said
              Croydon had *falsely accused* her partner, attorney Kevin Zeese, of *sexual assault*
18            in 2006.  "It is really sad she is given any credibility," said Flowers.  "I have
              known Shahid for at least a decade; I have a lot of respect for him."[17]

19 *Plaintiffs' Request for Correction.*  At 5:44 am the next morning (**July 22, 2020**), Buttar

20 for Congress' Patricia Brooks sent an email to the *Chronicle*'s Joe Garofoli.  In her email, Ms.

21 Brooks again stated that (1) Ms. Croydon's allegations about Mr. Buttar were false, and (2) "a

22 number of voices" had been "left out" from the *Chronicle*'s story.  To that end, Ms. Brooks

23 requested that the *Chronicle* correct the Original Piece by, *inter alia*, interviewing individuals

24 "closer to this situation" (such as Dr. Flowers or Ms. Zundmanis).[18]

25 _____

26 [14]    FAC ¶26.
   [15]    FAC ¶27.
27 [16]    FAC ¶28.
   [17]    FAC ¶29.
28 [18]    FAC ¶¶30, 31.

OPPOSITION

In response, in a **July 22, 2020** email, Mr. Garofoli invited Ms. Brooks to submit an opinion (op-ed) piece to the *Chronicle* (at the time, the *Chronicle*'s opinions editor was John Diaz). Within a matter of hours, Buttar for Congress submitted an opinion piece to the *Chronicle*. Specifically, Ms. Brooks responded to Mr. Garofoli's July 22, 2020 email and added Mr. Diaz to the recipient list. In response, Mr. Diaz sent Ms. Brooks an email on July 23,2020. In that email, Mr. Diaz refused to publish the Opinion Piece in the interest of "fairness".[19]

Upon information and belief, Mr. Diaz was authorized to receive correction requests on behalf of the *Chronicle*'s publisher; alternatively, the *Chronicle*'s publisher had actual knowledge of Ms. Brooks' July 22, 2020 correction request within 20 days of her request.[20]

*Author Chris Sampson's Email to the* <u>Chronicle</u> *regarding Ms. Croydon's Credibility.* The next day (**July 23, 2020**) at 4:22 pm, Mr. Garofoli and two other *Chronicle* employees received an email from Chris Sampson, a national security expert.[21]

In that email, Mr. Sampson stated that Ms. Croydon was a "pathological liar" who had "harassed" one of his friends "repeatedly in private texts to the point of [his] friend considering suicide." Mr. Sampson further stated that he had "no association" with Mr. Buttar and had "never talked with him." Mr. Sampson also stated that he contacted Buttar for Congress when he "saw [Ms. Croydon's] accusation".[22] Mr. Sampson ended his email by expressing his disappointment with the *Chronicle*:

> You had a duty to tell the readers the truth.
>
> You should do a better job in the future or consider your reputation destroyed.[23]

*Other Published Articles Examining Ms. Croydon's Credibility.* On **July 23, 2020,** the day after the Original Piece was published, the *Intercept* covered Ms. Croydon's allegations. Significantly, the *Intercept* expressly stated that a number of individuals had questioned Ms.

---

[19] FAC ¶¶33, 34.
[20] FAC ¶35; *Freedom Newspapers, Inc. v. Superior Court*, 4 Cal.4th 652, 658 (Cal. 1992).
[21] FAC ¶36.
[22] FAC ¶¶37, 38.
[23] FAC ¶39.

OPPOSITION

Croydon's credibility: "The *Intercept* has spoken to several people who recounted having disturbing interactions with Croydon that caused them to question her credibility."[24]

*The Open Letter Regarding Ms. Croydon's Credibility.* The next day (**July 24, 2020**), the *Independent Political Report* published an open letter (the "Open Letter"), in which 17 individuals (including Dr. Flowers, Ms. Zundmanis, and former federal candidate Kevin Zeese) expressed deep concern regarding Ms. Croydon's credibility and described her history of false allegations against political activists:

> The accuser [Ms. Croydon] is well known in the D.C. social-justice community. Unfortunately, this troubled individual has a long history of fabricating attacks against innocent people. A review of litigation she has filed in various jurisdictions would likely yield a revealing picture to an enterprising journalist. She has engaged in *late-night phone harassment campaigns, false allegations, and physical threats* against numerous individuals over the years. She is NOT a credible witness against this promising progressive leader."[25]

Two months later (**Sept. 25, 2020**), after conducting a follow-up investigation, the *Intercept* delivered a definitive, sobering conclusion regarding Ms. Croydon's allegations about Mr. Buttar: "Yet Croydon's claims *have not been borne out*. The Intercept was ***not** able to corroborate Croydon's allegations* and has interviewed multiple sources who recounted having disturbing interactions with her that *caused them to question her credibility*."[26]

The *Intercept*'s Sept. 25, 2020 findings prompted it to update its original, July 23, 2020 article. Specifically, the *Intercept* placed an "editor's note" in a prominent position at the top of the article text.[27]

*The* Chronicle*'s Follow-Up Piece on Ms. Croydon's Allegations.* On **July 25, 2020** the *Chronicle* published a follow-up piece (the "Follow-Up Piece") by Mr. Garofoli, regarding Ms. Croydon's allegations.[28] Although it quoted individuals who defended Mr. Buttar's ethics and

---

[24] FAC ¶40.
[25] FAC ¶41. A copy of the Open Letter has been attached as RJN **Exhibit H** to the Sept. 23, 2022 Ibarguen Declaration.
[26] FAC ¶42 (*quoting* Akela Lacy, *Intercept*, Sept. 25, 2020, "Shahid Buttar's Bid to Unseat Nancy Pelosi Roiled by Staff Mistreatment") (italics and bold print added).
[27] FAC ¶43.
[28] FAC ¶44.

OPPOSITION

integrity, the Follow-Up Piece was misleading in two major ways. *First*, it portrayed those

individuals as Mr. Buttar's friends, when they are fiercely independent political activists.[29]

Second, even though Mr. Garofoli had been apprised by Dr. Flowers, Ms. Zundmanis,

other signatories of the Open Letter, and Mr. Sampson that Ms. Croydon had a long history of

false accusations against political activists (including Kevin Zeese, a federal candidate), the

Follow-Up Piece failed to disclose that highly relevant history to *Chronicle* readers.[30]

To make matters worse, the Follow-Up Piece *did not even provide a hyperlink* to the Open

Letter. In stark contrast, both the *Chronicle*'s Original Piece and Follow-Up Piece had provided

hyperlinks to Ms. Croydon's false, self-published *Medium* allegations.[31] As a result, *Chronicle*

readers were deprived of critical information: the deep concerns of 17 individuals regarding Ms.

Croydon's lack of credibility.

The *Chronicle* has never published a piece like the Original Piece about a White male

candidate for office.[32] In the United States, Islam is one of the most stigmatized religions. Only

42 percent of Americans have a favorable view of Islam, according to a 2021 Associated

Press/Norc Center for Public Affairs Research poll.[33]

Joe Biden and Pete Buttigieg, who are both White males, were both accused of sexual

misconduct during their respective Presidential candidacies. The *Chronicle* did not rush to

publish any of those accusations. Instead, the *Chronicle* demonstrated the care it owed its readers

and the public at large.[34]

*The Harm Suffered by Plaintiffs.* The *Chronicle*'s publication of the Original Piece

delivered crippling blows to Mr. Buttar's insurgent campaign against House Speaker Pelosi, who

defeated Mr. Buttar on Nov. 3, 2020; and also played a critical role in Mr. Buttar's failure to

---

[29]     FAC ¶45.

[30]     FAC ¶46.

[31]     FAC ¶50.

[32]     FAC ¶52.

[33]     FAC ¶53; Associated Press, "Two Decades after 9/11, Muslim Americans still fighting bias", *available at* https://apnews.com/article/September-11-Muslim-Americans-93f97dd9219c25371428f4268a2b33b4, Sept. 6, 2021 (last visited Sept. 21, 2022).

[34]     FAC ¶54.

OPPOSITION

qualify for the Nov. 8, 2022 Congressional general election.  Ms. Croydon's false accusations were immediately and consistently seized upon by critics across the political spectrum – including K-Hive, an organized network of certain supporters of Vice President Kamala Harris.[35]  Indeed, taking the cue from San Francisco's only newspaper of record, local media outlets such as the San Francisco *Bay Guardian*, *48 Hills*, and *Mission Local* published their own stories that referenced Ms. Croydon's false allegations.[36]

The *Chronicle*'s publication of Ms. Croydon's false allegations misled voters in a federal election.  Against such a backdrop, the *Chronicle*'s defamation of Mr. Buttar undermined Mr. Buttar, the integrity of our elections, and our very democracy.[37]

*The Specific Damages Suffered by Plaintiffs*.  The repeated indulgence and publication of false harassment claims by a newspaper of record destroyed Mr. Buttar's campaign for public office, ended any possibility of future public service, foreclosed future opportunities to return to his well established career of non-profit advocacy, and blocked a visionary public policy agenda that had previously attracted unprecedented support – all while both leveraging and reinforcing harmful racial and religious stereotypes.[38]

*The Harm Suffered by Mr. Buttar*.  In his individual capacity, Mr. Buttar suffered grave harm due to the *Chronicle*'s malice.  First, the *Chronicle*'s smears ended the possibility of him returning to his non-profit legal advocacy career.  He has interviewed for several positions, including Executive Director roles akin to those he held before running for office, but the reputational damage of the character assassination has imposed a dramatic chilling effect on potential employers.  Mr. Buttar previously earned $100,000 at the Electronic Frontier Foundation, which served as the basis for his campaign salary.  Having been 46 when he was smeared, he has lost 19 years of earnings capacity based on a 65-year retirement age.  The value of Mr. Buttar's lost earnings (ignoring potential salary growth or inflation) total $1.9 million.[39]

---

[35] FAC ¶¶56, 57.
[36] FAC ¶58.
[37] FAC ¶62.
[38] FAC ¶63.
[39] FAC ¶¶84-86.

OPPOSITION

1    Mr. Buttar also suffered grievous emotional harm and suffering, was unable to sleep

2  soundly for nearly a year, and was driven to seek therapy to recover.  The harm to his

3  relationships has been incalculable.  A friend of over 20 years whom he had dated for nearly five

4  years severed their friendship citing the *Chronicle* article.  Mr. Buttar had previously spoken at

5  her wedding.  At the time he was smeared, he had been a regular guest on progressive news

6  programs and increasingly a source cited publications from *Rolling Stone* to the *Intercept*.[40]

7    That all came to a screeching halt.  As a creative person poised to publish works including

8  poetry, music, and non-fiction political analysis, the harm to Mr. Buttar's public voice has been

9  multi-dimensional.  Attempts to secure a book contract have proven unsuccessful, and his social

10  media reach has collapsed.[41]

11    *2020 Campaign*.  When the *Chronicle* published the false accusations toward Mr. Buttar

12  in July 2020, the campaign had raised approximately $1.2 million since its April 2019 launch for

13  the 2020 campaign cycle.  Until that point, the campaign had achieved a quarter-over-quarter

14  growth rate of 96%, reflecting historically unprecedented support from across the country that

15  was poised—absent the *Chronicle*'s character assassination and the ensuing "civic lynching"

16  documented by the SF *Bayview*—to continue.[42]

17    Instead, the campaign's fundraising collapsed, quickly falling to roughly a third of its

18  previous level, and then further.  It never recovered.  The *Chronicle*'s publication led to a

19  proverbial run on the bank, as many donors sought refunds of their contributions and former

20  staffers attempted to extract resources from the campaign.[43]

21    A comparison between the first and second weeks in July makes the impacts of the "civic

22  lynching" documented by the SF Bayview—in which the *Chronicle* played a crucial enabling

23  role—inescapably clear.  A comparison between the two months preceding the *Chronicle*'s

24  repeated acts of malice and recklessness, and the two that followed it, also makes clear the

---

25  [40]    FAC ¶¶87-89.

26  [41]    FAC ¶¶90-92.

27  [42]    FAC ¶¶63-65 & Chart 1; Gloria Berry, "White Supremacy in San Francisco," San Francisco *Bayview*, Aug. 26, 2021, *available at https://sfbayview.com/2021/08/white-supremacy-in-san-francisco/* (last visited Aug. 11, 2022).

28  [43]    FAC ¶¶66, 67 & Chart 2.

OPPOSITION

impacts of *Chronicle*'s defamation.[44]

The campaign never recovered.  Over the remainder of the campaign cycle, it was forced to shed staff, largely suspend its field operation, and dedicate its few press opportunities to fending off lies rather than advocating for the climate justice, racial justice, and economic justice goals that animated the campaign and inspired tens of thousands of supporters across the country to invest in it.  Furthermore, as a result of the *Chronicle*'s defamation, all of the campaign's supporters were harmed, as well as each of the 81,000 San Franciscans who voted for change despite the *Chronicle*'s concerted efforts to undermine democratic accountability.[45]

Based on its observed growth rate prior to the *Chronicle*'s defamatory publications, the 2020 campaign lost $2,048,673 in projected contributions.  Ultimately, the $1.6 million raised by the campaign over the 2019-20 campaign cycle was reduced to worthlessness. The *Chronicle*'s defamatory, reckless, and malicious publication was the proximate cause of that harm.[46]

*2022 Campaign*.  The campaign continued to endure harm from the *Chronicle*'s defamatory, reckless, and malicious publications through its conclusion in June 2022, when the plaintiff's political career ended with his loss in the primary election to a Republican challenger. After becoming the first Democrat to win the top-two primary alongside the incumbent in 2020, the plaintiff's campaign could have been well-situated to grow.  Due to the *Chronicle*'s character assassination, Mr. Buttar and his campaign were effectively hobbled and never able to recover any of their prior momentum.[47]

In June 2020—the last full month before the *Chronicle*'s reckless and malicious publication—the campaign raised $234,521.  Even setting aside any possible growth from its established support base at that time, presuming the campaign had merely continued with a flat rate of growth, it would have raised $3,986,857 through the June 2022 primary election.  Hobbled by the *Chronicle*'s indulgence of partisan character assassination, the 2022 campaign instead raised only $188,140, enduring a loss of $3,798,717. Based on its previous 96% quarter-to-

---

[44]    FAC ¶¶68, 69 & Charts 3-6.
[45]    FAC ¶¶70, 71.
[46]    FAC ¶¶72, 73.
[47]    FAC ¶¶74-76.

OPPOSITION

1  quarter growth rate, if the *Chronicle* had not published the defamatory articles, the campaign

2  would have raised over $25 million—as much as the career incumbent who has held the seat

3  since 1987—for the 2022 election cycle.[48]

4      *Lost Volunteer Time*.  Before the *Chronicle*'s defamation, the campaign mobilized more

5  than 30 volunteers each week for up to 10 hours each.  Using 5 hours per volunteer per week as a

6  conservative estimate, and estimating the value of their time based on the local $15 minimum

7  wage, the value of their time was roughly $2,250 per week.  The campaign's volunteer

8  recruitment, retention, and management program effectively collapsed, leaving it with no more

9  than a handful of volunteers heading into the 2020 general election.   During the 2020 election,

10  the value of their lost work over the ensuing 14 weeks amounted to $31,500.  Over the 2022

11  cycle, it amounted to $184,500.[49]

12  **III.   Legal Analysis**

13      A.   <u>Plaintiffs Have Sufficiently Alleged Defamation and Associated UCL Claims</u>

14      Plaintiffs have sufficient alleged their claims for Defamation and violations of the Unfair

15  Competition Law (B&P §§17200, et seq.),[50] for they have (1) alleged sufficient facts showing

16  Defendant's actual malice, (2) made a timely request for a correction of the Original Piece

17  pursuant to Civil Code 48a, and (3) properly alleged damages they have suffered due to

18  Defendant's wrongdoing.

19      *Overview of Anti-SLAPP Analysis.*  Contrary to Defendant's claim, Plaintiffs' allegations

20  amply satisfy the requirements of the second prong[51] of the Anti-SLAPP analysis (as well as

21  those of a Rule 12(b) motion to dismiss).  An anti-SLAPP motion should only combat "meritless

22  suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe

23  economic sanctions against the defendant, and not to vindicate a legally cognizable right."[52]

24  ――――――――――――――

25  [48]    FAC ¶¶77, 78, 80.
   [49]    FAC ¶¶81-83.

26  [50]    UCL claims may be brought for any "unlawful, unfair, *or* fraudulent practice" *Cel-Tech
   Comms., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 180 (Cal. 1999) (italics in original).

27  [51]    Plaintiffs do not dispute that the first prong of the Anti-SLAPP analysis has been satisfied.
   [52]    *Hewlett Packard Co. v. Oracle Corp.*, 239 Cal.App.4th 1174, 1183 (Cal.Ct.App. 2015)

28  (citations omitted).

OPPOSITION

1    Under CCP §425.16(b)(1), a cause of action is subject to an anti-SLAPP motion *only* "if

2    the defendant shows that the cause of action arises from an act in furtherance of the defendant's

3    constitutional right of petition or free speech in connection with a public issue *and* the plaintiff

4    fails to demonstrate a probability of prevailing on the claim."[53]

5    Thus, a defendant must satisfy two requirements to strike a cause of action:  (1) it must

6    show that the cause of action (1) "arises from protected speech or petitioning", and (2) "lacks

7    even *minimal* merit".[54]  "First, the court decides whether the defendant has made a *threshold*

8    *showing* that the challenged cause of action is one arising from the protected activity.  Second, if

9    the court finds such a showing has been made, it then determines whether the plaintiff has

10   demonstrated a probability of prevailing on the claim."[55]  In that regard, a plaintiff need establish

11   only "minimal merit" in his or her legal claim.  Put another way, a plaintiff need only show a

12   "*minimum level* of legal sufficiency and triability" to carry its burden.[56]

13   *Defendant's Actual Malice.*  Plaintiffs are entitled to move forward with their Defamation

14   claim with respect to the Follow-Up Piece, for they have properly alleged the requisite facts and

15   harm.  In relevant part, public figures like Plaintiffs must (1) allege that the published statement is

16   false, and (2) the defendant made the defamatory statement at issue with <u>actual malice</u>:  "that is,

17   with knowledge that it was false or with *reckless disregard of whether it was false or not*."[57]

18   "[A]ctual malice can be proved by *circumstantial evidence*."[58]  To that end, a plaintiff

19   may prove actual malice by showing that the Defendant, *inter alia*, (a) relied on a source "known

20   to be unreliable", or (b) failed to investigate in light of the source's known lack of reliability.[59]  A

21

22   [53]    *Ulkarim v. Westfield LLC*, 227 Cal.App.4th 1266, 1273 (Cal.Ct.App. 2014) (italics added);
     *see also Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (Cal. 2002).

23   [54]    *Ulkarim*, 227 Cal.App.4th at 1275 (italics added) (*quoting Navellier v. Sletten*, 29 Cal.4th
     82, 89 (Cal. 2002)).

24   [55]    *Hanover Ins. Co. v. Fremont Bank*, 68 F.Supp.2d 1085, 1096-97 (N.D. Cal. 2014) (italics
     added, quotation marks omitted) (*quoting Equilon*, 29 Cal.4th at 67).

25   [56]    *Soukup v. Law Offices of Herbert Hafif*, 39 Cal.4th 260, 291 (Cal. 2006) (italics added,
     citation and internal quotation marks omitted).

26   [57]    *Reader's Digest Assn. v. Superior Court*, 37 Cal.3d 244, 253-54 (Cal. 1984) (italics
27   added); *accord, Balla v. Hall*, 59 Cal.App.5th 652, 683 (Cal.Ct.App. 2021).

     [58]    *Reader's Digest*, 37 Cal.3d at 257 (italics added); *accord, Balla*, 59 Cal.App.5th at 683.
28   [59]    *Balla*, 59 Cal.App.5th at 683.

OPPOSITION

1  plaintiff thereby shows that "publisher himself had *serious doubts* regarding the truth of his

2  publication."[60]

3        *Ms. Croydon's Lack of Reliability*.  As the U.S. Supreme Court has admonished,

4  "recklessness may be found where there are *obvious reasons* to doubt the veracity of the

5  informant or the accuracy of his reports."[61]  Contrary to Defendant's claim, it is hornbook law

6  that actual malice may be found where a reporter either had personal doubts about the informant

7  or *was put on notice* that the informant may be unreliable.[62]  Indeed, courts have found actual

8  malice where the reporter's source had a known reputation for untrustworthiness, including

9  writing bad checks or being a "self-described pathological liar".[63]

10        For example, in *Stevens v. Sun Publishing Co.*, an individual had informed a reporter that

11  his source (the former spouse of the person featured in his story) was unreliable.[64]  However, the

12  reporter printed the story without taking any steps to corroborate his source's account.  In

13  response, the South Carolina Supreme Court held that "actual malice is established when

14  reporters and publishers depart from *responsible standards of investigation* and print articles on

15  the basis of an *admittedly unreliable source*, without further investigation.[65]

16        Here, Plaintiffs (1) told the *Chronicle* reporter (Joe Garofoli) that Ms. Croydon's claim of

17  sexual harassment was false, and (2) repeatedly offered to connect Mr. Garofoli with individuals

18  such as Dr. Flowers and Ms. Zundmanis, who both would have provided details of Ms.

19  Croydon's history of lobbing false allegations – including Ms. Croydon's claim that Dr. Flower's

20  husband had sexually assaulted her.  In response, the *Chronicle* did not subsequently contact or

21  interview either Dr. Flowers or Ms. Zundmanis.

22        Furthermore, in the Follow-Up Piece, Defendant not only refused to investigate the

23  evidence that was proffered by Plaintiffs and actually used by the *Bay Area Reporter*, but ignored

24

25  [60]    *Reader's Digest*, 37 Cal.3d at 258 (italics added); *accord*, *Balla*, 59 Cal.App.5th at 683.
   [61]    *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (italics added).

26  [62]    *Richmond Newspapers v. Lipscomb*, 234 Va. 277, 290 (Va. 1987) (listing cases).
   [63]    *Curtis v. Butts*, 388 U.S. 130, 157-58 (1967) (bad checks); *Pep v. Newsweek*, 553 F.Supp.

27  1000, 1001 (S.D.N.Y. 1983) (source was a "self-described pathological liar").
   [64]    *Stevens v. Sun Publishing Co.*, 240 S.E.2d 812, 270 S.C. 65, 72 (S.C. 1978).

28  [65]    *Id.* at 72 (italics added).

OPPOSITION

1   additional red flags regarding Ms. Croydon's credibility.  For example, a July 23, 2020 *Intercept*

2   article (published the day after the Original Piece) expressly stated that a number of individuals

3   had questioned Ms. Croydon's credibility:  "The *Intercept* has spoken to several people who

4   recounted having disturbing interactions with Croydon that caused them to question her

5   credibility."[66]

6        Equally troubling, the *Chronicle* ignored the July 23, 2020 email that it had received from

7   Chris Sampson, a national security expert who had never previously spoken with Mr. Buttar or

8   contacted his campaign.  Mincing no words, Mr. Sampson stated that Ms. Croydon was a

9   "*pathological liar*" who had "harassed" one of his friends "repeatedly in private texts to the point

10  of [his] friend considering *suicide*."[67]

11       What is more, the Follow-Up Piece did not report on the Open Letter's troubling account

12  of Ms. Croydon's history of making false allegations.  In the Open Letter, a whopping 17

13  individuals (including Dr. Flowers, Ms. Zundmanis, and former federal candidate Kevin Zeese)

14  expressed deep concern regarding Ms. Croydon's credibility and described Ms. Croydon's history

15  of making false claims against political activists:

16       The accuser [Ms. Croydon] is well known in the D.C. social-justice community.
17       Unfortunately, this troubled individual has a long history of fabricating attacks
         against innocent people.  A review of litigation she has filed in various
18       jurisdictions would likely yield a revealing picture to an enterprising journalist.
         She has engaged in *late-night phone harassment campaigns, false allegations, and*
19       *physical threats* against numerous individuals over the years.  She is NOT a
         credible witness against this promising progressive leader."[68]
20

21       Making matters even worse, while both the Original Piece and Follow-Up Piece had

22  provided hyperlinks to Ms. Croydon's false, self-published *Medium* allegations, the Follow-Up

23  Piece *did not even provide a hyperlink* to the Open Letter.  As a result, *Chronicle* readers were

24  deprived of critical information:  the deep concerns of 17 individuals regarding Ms. Croydon's

25  lack of credibility.

26       Against this factual backdrop, the *Chronicle* (1) was presented with a grave allegation;

27  [66]    FAC ¶41.
    [67]    FAC ¶37 (italics added).
28  [68]    FAC ¶41.

OPPOSITION

1    and (2) republished the allegation – even after it had received numerous red flags regarding the

2    accuser's credibility from a broad spectrum of sources:  other media outlets, a national security

3    expert who deemed the accuser a "pathological liar", the Open Letter from 17 individuals, and

4    Mr. Buttar's campaign.  In stark contrast – and the day *before* the Original Piece was printed (July

5    21, 2020) – the *Bay Area Reporter* not only interviewed Dr. Flowers and Ms. Zundmanis, but

6    published their statements regarding Ms. Croydon's lack of credibility.[69]

7        In short, the *Chronicle*'s reporter relied on a source even though "there [were] *obvious*

8    *reasons* to doubt the veracity of the informant".[70]  Therefore, Plaintiffs have sufficiently alleged

9    that the *Chronicle* relied on a source known to be unreliable, with respect to the Follow-Up Piece.

10        *The <u>Chronicle's</u> Failure to Investigate*.  As the California Supreme Court has admonished,

11   "before *republishing* an accusation *likely to have a devastating effect* on the reputation of the

12   person accused", one must "*take the time necessary to investigate* the matter with sufficient

13   thoroughness to form an independent judgment[.]"[71]  Such a duty to investigate arises not only

14   with allegations that someone has committed a crime, but also with non-criminal allegations

15   regarding one's conduct – including a "gross breach" of professional ethics.[72]

16        Furthermore, a reporter or publication has a duty to investigate if its source or report is

17   known to be untrustworthy or potentially biased.[73]  For example, in *Pep v. Newsweek*, the

18   Southern District of New York held that a reporter had a duty to investigate, where his source was

19   a "self-described *pathological liar*".[74]  Similarly, in *Suzuki Motor Corp. v. Consumers Union*, the

20   Ninth Circuit held that the publication had a duty to investigate, where it knew that its safety

21   report was potentially biased.[75]

---

22   [69]    FAC ¶¶28, 27.

23   [70]    *St. Amant*, 390 U.S. at 732 (italics added).

24   [71]    *Khawar v. Globe Int'l, Inc.*, 19 Cal.4th 254, 277 (Cal. 1998) (italics added); *accord*,
     *Widener v. Pacific Gas & Elec. Co.*, 75 Cal.App.3d 415, 434 (Cal. 1977), disapproved on other
     grounds, *McCoy v. Hearst Corp.*, 42 Cal.3d 835, 846 n.9 (Cal. 1986).

25   [72]    *Khawar*, 19 Cal.4th at 277 (Cal. 1998) (defamatory accusation that an individual had
26   committed murder); *Widener*, 75 Cal.App.3d at 423 ("gross breach" of professional ethics).

     [73]    *Pep*, 553 F.Supp. at 1001 (source was a "self-described pathological liar"); *Suzuki v.*
27   *Consumers Union*, 330 F.3d 1110, 1138-39 (9th Cir. 2002).

     [74]    *Pep*, 553 F.Supp. at 1001 (italics added).

28   [75]    *Suzuki*, 330 F.3d at 1138-39.

OPPOSITION

1    Here, with respect to the Follow-Up Piece, the *Chronicle* (1) was presented with a grave

2    allegation that would have a "devastating effect" on the reputation of Plaintiffs; and (2) refused to

3    investigate the allegation – even after it had received numerous red flags regarding the accuser's

4    credibility from a broad spectrum of sources identified above.  In short, the *Chronicle*'s reporter

5    refused to investigate the allegations of a source even though "there [were] *obvious reasons* to

6    doubt the veracity of the informant".[76]  Accordingly, Plaintiffs have sufficiently alleged that the

7    *Chronicle* failed in its duty to investigate Ms. Croydon's allegations, with respect to the Follow-

8    Up Piece.

9          B.    <u>Plaintiffs Properly Alleged Their Defamation Claims Under the Correction Statute</u>

10    Contrary to Defendant's claim, Plaintiffs have properly alleged their claims under the

11    Correction Statute (Civil Code §48a).  In defamation cases, Section 48a requires a plaintiff to

12    request a correction within 20 days of the publication of the defamatory material.[77]  That statute

13    does "not intend to build *technical barricades* to recovery by the individual who had given notice

14    sufficient to advise a reasonable publisher acting in good faith of the claimed error.  The crucial

15    issue in evaluating the adequacy of the notice turns on whether the publisher should *reasonably*

16    *have comprehended* which statements plaintiff protested and wished corrected."[78]

17    Here, Plaintiffs properly and timely requested that the *Chronicle* for a correction of the

18    Original Piece.  Namely, on the same day that the Original Piece was printed (**July 22, 2020**),

19    Buttar for Congress' Patricia Brooks sent an email to the *Chronicle*'s Joe Garofoli.  In her email,

20    Ms. Brooks stated that (1) Ms. Croydon's allegations about Mr. Buttar were false, and (2) "a

21    number of voices" had been "left out" from the *Chronicle*'s story.  To that end, Ms. Brooks

22    requested that the *Chronicle* correct the Original Piece by, *inter alia*, interviewing individuals

23    "closer to this situation" (such as Dr. Flowers or Ms. Zundmanis, who would have spoken about

24    the false claim of sexual assault that Ms. Croydon had made against former federal candidate

25    Kevin Zeese).[79]

26    _____

27    [76]   *St. Amant*, 390 U.S. at 732 (italics added).
      [77]   *Anschutz Ent. Group, Inc. v. Snepp*, 171 Cal.App.4th 598, 641 (Cal.Ct.App. 2009)
      [78]   *Id.* at 641 (italics added) (citations omitted).
28    [79]   FAC ¶¶29, 30.

OPPOSITION

1    In a **July 22, 2020** email, Mr. Garofoli invited Ms. Brooks to submit an opinion (op-ed)

2  piece to the *Chronicle*.  At the time, the *Chronicle*'s opinions editor was John Diaz.  Upon

3  information and belief, Mr. Diaz was authorized to receive correction requests on behalf of the

4  *Chronicle*'s publisher; alternatively, the *Chronicle*'s publisher had actual knowledge of Ms.

5  Brooks' July 22, 2020 correction request within 20 days of her request.[80]

6    Within a matter of hours of receiving Mr. Garofoli, Ms. Brooks submitted an opinion

7  piece to the *Chronicle*, by responding to Mr. Garofoli's July 22, 2020 email and added Mr. Diaz

8  to the recipient list.  In response, Mr. Diaz sent Ms. Brooks an email on July 23, 2020.  In that

9  email, Mr. Diaz refused to publish the Opinion Piece in the interest of "fairness".[81]  Instead, the

10  *Chronical* published the Follow-Up Piece.  Consequently, Plaintiffs' correction request was

11  timely as a matter of law.

12    Because Ms. Brooks requested that the *Chronicle* correct the Original Piece by

13  interviewing individuals like Dr. Flowers and Ms. Zundmanis, the *Chronicle* should "reasonably

14  have comprehended" that Plaintiffs sought to correct the omission of Ms. Croydon's history of

15  lobbing false accusations.  Because they made a proper, timely request to the *Chronicle*, Plaintiffs

16  have properly alleged their Defamation claims under Section §48a.

17    C.    Plaintiffs Have Properly Alleged Damages

18    Finally, Plaintiffs have properly alleged damages that they suffered due to Defendant's

19  wrongdoing.  With respect to general damages (to which they are entitled because they complied

20  with Section 48a), Plaintiffs are entitled to seek damages for *assumed* harm to their reputation,

21  and need not allege any damages for *specific* harm to their reputation.[82]  With respect to special

22  damages, Plaintiffs are entitled to seek damages to their "property, business, trade, profession, or

23  occupation".[83]

24    The repeated indulgence and publication of false harassment claims by a newspaper of

25

26  [80]    FAC ¶35; *Freedom Newspapers*, 4 Cal.4th at 658.
    [81]    FAC ¶¶33, 34.

27  [82]    *Weller v. American Broadcasting Cos., Inc.*, 232 Cal.App.4th 991, 1014 (Cal.Ct.App.
    1991); *Di Giorgio Fruit Corp. v. AFL-CIO*, 215 Cal.App.2d 560, 577 (Cal.Ct.App. 1963).

28  [83]    Civil Code §48a(d)(2).

OPPOSITION

record destroyed Mr. Buttar's campaign for public office, ended any possibility of future public service, foreclosed future opportunities to return to his well established career of non-profit advocacy, and blocked a visionary public policy agenda that had previously attracted unprecedented support – all while both leveraging and reinforcing harmful racial and religious stereotypes.[84]

*Mr. Buttar's General and Special Damages*.  In his individual capacity, Mr. Buttar suffered grave harm due to the *Chronicle*'s malice.  First, the *Chronicle*'s smears ended the possibility of him returning to his non-profit legal advocacy career.  He has interviewed for several positions, including Executive Director roles akin to those he held before running for office, but the reputational damage of the character assassination has imposed a dramatic chilling effect on potential employers.  Mr. Buttar previously earned $100,000 at the Electronic Frontier Foundation, which served as the basis for his campaign salary.  Having been 46 when he was smeared, he has lost 19 years of earnings capacity based on a 65-year retirement age.  The value of Mr. Buttar's lost earnings (ignoring potential salary growth or inflation) total $1.9 million.[85]

Mr. Buttar also suffered grievous emotional harm and suffering, was unable to sleep soundly for nearly a year, and was driven to seek therapy to recover.  The harm to his relationships has been incalculable.  A friend of over 20 years whom he had dated for nearly five years severed their friendship citing the *Chronicle* article.  Mr. Buttar had previously spoken at her wedding.  At the time he was smeared, Mr. Buttar had been a regular guest on progressive news programs and increasingly a source cited by writers across the country, from *Rolling Stone* to the *Intercept*.[86]  That all came to a screeching halt.  As a creative person poised to publish works including poetry, music, and non-fiction political analysis, the harm to Mr. Buttar's public voice has been multi-dimensional.  Attempts to secure a book contract have proven unsuccessful, and his social media reach has collapsed.[87]

*Campaign's General and Special Damages:  2020 Campaign*.  When the *Chronicle*

---

[84] FAC ¶63.
[85] FAC ¶¶84-86.
[86] FAC ¶¶87-89.
[87] FAC ¶¶90-92.

OPPOSITION

published the false accusations toward Mr. Buttar in July 2020, the campaign had raised approximately $1.2 million since its April 2019 launch for the 2020 campaign cycle. Until that point, the campaign had achieved a quarter-over-quarter growth rate of 96%, reflecting historically unprecedented support from across the country that was poised—absent the *Chronicle*'s character assassination and the ensuing "civic lynching" documented by the SF *Bayview*—to continue.[88]

Instead, the campaign's fundraising collapsed, quickly falling to roughly a third of its previous level, and then further. It never recovered. The *Chronicle*'s publication led to a proverbial run on the bank, as many donors sought refunds of their contributions and former staffers attempted to extract resources from the campaign.[89]

Over the remainder of the campaign cycle, the campaign was forced to shed staff, largely suspend its field operation, and dedicate its few press opportunities to fending off lies. Furthermore, as a result of the *Chronicle*'s defamation, all of the campaign's supporters were harmed, as well as each of the 81,000 San Franciscans who voted for change despite the *Chronicle*'s concerted efforts to undermine democratic accountability.[90]

Based on its observed growth rate prior to the *Chronicle*'s defamatory publications, the 2020 campaign lost $2,048,673 in projected contributions. Ultimately, the $1.6 million raised by the campaign over the 2019-20 campaign cycle was reduced to worthlessness. The *Chronicle*'s defamatory, reckless, and malicious publication was the proximate cause of that harm.[91]

*Campaign's General and Special Damages: 2022 Campaign*. Due to the *Chronicle*'s character assassination, Mr. Buttar and his campaign were effectively hobbled and never able to recover any of their prior momentum.[92] In June 2020—the last full month before the *Chronicle*'s reckless and malicious publication—the campaign raised $234,521.

---

[88]     FAC ¶¶63-65 & Chart 1; Gloria Berry, "White Supremacy in San Francisco," San Francisco *Bayview*, Aug. 26, 2021, *available at https://sfbayview.com/2021/08/white-supremacy-in-san-francisco/* (last visited Aug. 11, 2022).
[89]     FAC ¶¶66, 67 & Chart 2.
[90]     FAC ¶¶70, 71.
[91]     FAC ¶¶72, 73.
[92]     FAC ¶¶74-76.

OPPOSITION

1    Even setting aside any possible growth from its established support base at that time,

2    presuming the campaign had merely continued with a flat rate of growth, it would have raised

3    $3,986,857 through the June 2022 primary election.  Hobbled by the *Chronicle*'s indulgence of

4    partisan character assassination, the 2022 campaign instead raised only $188,140, enduring a loss

5    of $3,798,717.  Based on its previous 96% quarter-to-quarter growth rate, and if the *Chronicle*

6    had not published the defamatory articles, the campaign would have raised over $25 million—as

7    much as the career incumbent who has held the seat since 1987—for the 2022 election cycle.[93]

8    *Lost Volunteer Time*.  Before the *Chronicle*'s defamation, the campaign mobilized more

9    than 30 volunteers each week for up to 10 hours each.  Using 5 hours per volunteer per week as a

10   conservative estimate, and estimating the value of their time based on the local $15 minimum

11   wage, the value of their time was roughly $2,250 per week.  After the *Chronicle*'s defamation, the

12   campaign's volunteer recruitment, retention, and management program effectively collapsed,

13   leaving it with no more than a handful of volunteers heading into the 2020 general =

14   election.  During the 2020 election, the value of their lost work over the ensuing 14 weeks

15   amounted to $31,500.  Over the 2022 cycle, it amounted to $184,500.[94]

16   *Defendant's Liability*.  Contrary to Defendant's claim, the fact that other media outlets

17   followed the *Chronicle* in publishing Ms. Croydon's claims does not in any way mitigate

18   Defendant's liability.  Indeed, it is undisputed that all such pieces in the other outlets were

19   published *after* Ms. Croydon's claims were published in San Francisco's newspaper of record:

20   the *Chronicle*.  Put another way, if the *Chronicle* had not published Ms. Croydon's claims, they

21   would *not have been covered* by other media outlets.  Because the *Chronicle* caused the media

22   feeding frenzy that followed, Defendant Hearst is liable for all harm that it inflicted.

23   **IV.   Conclusion**

24   Had Mr. Buttar been a White male such as Joe Biden or Pete Buttigieg, rather than an

25   immigrant Muslim of Pakistani descent, the *Chronicle* would not have rushed to publish the false

26   claims of an unreliable source deemed to be a "pathological liar".  Instead, the *Chronicle* would

27   _____

28   [93]   FAC ¶¶77, 78, 80.
     [94]   FAC ¶¶81-83.

OPPOSITION

1  have thoroughly investigated those reputation-shattering claims before taking any further action.

2  Plaintiffs have met their "minimal burden" required to continue their quest to restore their good

3  name.[95]  Accordingly, Defendant's Motion must be denied.[96]

4

5

6  DATED:  Oct. 21, 2022                          BUSINESS, ENERGY, AND ELECTION
                                                  LAW, PC
7

8                                                 By: /s/ Gautam Dutta
9                                                      GAUTAM DUTTA, ESQ.

10

11                                                Attorneys for Plaintiffs

12                                                SHAHID BUTTAR FOR CONGRESS
                                                  COMMITTEE and SHAHID BUTTAR
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  [95]     *See* note 1 *supra*.
28  [96]     Alternatively, Plaintiffs seek leave to amend.  *See Sanchez v. Law Office of Armo*, No.
    1:20-cv-00163-NONE-SKO, 2021 WL 1214559, at *18 (E.D. Cal. Mar. 31, 2021) (italics added).

- 22 -                          OPPOSITION