UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHID BUTTAR FOR CONGRESS COMMITTEE, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>HEARST COMMUNICATIONS, INC.,<br><br>Defendant. | Case No. 21-cv-05566-EMC<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS, AND GRANTING DEFENDANT'S AND PLAINTIFFS' REQUESTS FOR JUDICIAL NOTICE**<br><br>Docket Nos. 47, 49, 56 |

Plaintiffs Shahid Buttar and Shahid Buttar for Congress Committee (collectively, "SBCC") filed suit against Defendant Hearst Communications, Inc. ("Hearst") for defamation and violation of California's unfair competition law. Docket No. 46 ("FAC"). SBCC's claims arise from two stories published in the *San Francisco Chronicle* in July 2020 reporting on allegations that Mr. Buttar, then a candidate for Speaker Nany Pelosi's seat in the U.S. House of Representatives, sexually harassed an acquaintance Elizabeth Croydon several years earlier. After its original complaint was dismissed with leave to amend, SBCC filed its First Amended Complaint.

Now pending before the Court is Hearst's motion to dismiss the FAC under Fed. R. Civ. P. 12(b)(6) and California's anti-SLAPP statute. Docket No. 47 ("MTD"). Also pending are Hearst's request for judicial notice, Docket No. 49 ("D's RJN"), and SBCC's request for judicial notice, Docket No. 56 ("P's RJN").

For the following reasons, the Court **GRANTS** Hearst's Request for Judicial Notice and **GRANTS** SBCC's Request for Judicial Notice. The Court **GRANTS** Hearst's Motion to Dismiss **WITH PREJUDICE**.

# I.     FACTUAL AND PROCEDURAL BACKGROUND

A.     Factual Background

Shahid Buttar was a Democratic candidate in the November 3, 2020 general election for California's 12th U.S. Congressional District in the 2020 general election, seeking to unseat U.S. Representative Nancy Pelosi. FAC ¶ 10. Shahid Buttar for Congress Committee was the organization constituting Mr. Buttar's 2020 campaign and, later, his 2022 campaign. FAC ¶ 14. Hearst is a Delaware corporation that owns the *San Francisco Chronicle*, a newspaper for the 12th Congressional District covering the City and County of San Francisco. FAC ¶ 6.

On July 21, 2020, Elizabeth Croydon published an essay on the website *Medium.com* titled "Shahid Buttar Repeatedly Sexually Harassed Me." FAC ¶ 16; Docket No. 28 (Declaration of Diego Ibarguen ("Ibarguen Decl.")) Exh. G ("Croydon Essay"). In her essay, Ms. Croydon alleged that when she and Mr. Buttar both lived in Washington, D.C. in the early 2000s and were part of the same activism and arts community, Mr. Buttar "made [her] feel uncomfortable," "repeatedly pursued [her] for sex," and "let [her] know that he was sexually available to [her] for years." Croydon Essay at 1. Ms. Croydon described an instance at Mr. Shahid's communal home where he "cornered [her] with his body and got so close and brushed up against [her] breasts. He blocked [her] in so [she] could not move away and gave [her] a weird smile that unnerved [her]." *Id.* at 1. Ms. Croydon describes another instance, about a decade later, where Ms. Croydon discussed her celibacy and Mr. Buttar responded with comments that made Ms. Croydon feel "degraded, nauseated, and revolted that he would mock me in front of friends who looked to me as an outspoken voice for women." *Id.* at 1–2. Ms. Croydon opined that: "Based on my personal experiences and many others not detailed, Shahid Buttar is not trustworthy or deserving of holding elected office. . . . We on the left must hold ourselves to a higher standard as we are committed to creating a just and equitable world, free from sexual misconduct, misogyny and bullying . . . . The left can do better than Shahid Buttar." *Id.* at 2–3.

That same day, on July 21, 2020, Hearst published an article online in the *San Francisco Chronicle* regarding the public controversy sparked by the allegations in Ms. Croydon's essay. FAC ¶¶ 16–17; Ibarguen Decl. Exh. A ("First Article"). The article was written by reporter Joe

2

Garofoli and titled "Shahid Buttar, Nancy Pelosi's Election Opponent, Accused of Sex Harassment." FAC ¶ 16. Prior to publishing the article, Mr. Garofoli reached out to SBCC for a statement. FAC ¶¶ 18–19. The next day, Hearst published the same article in its print version of the *San Francisco Chronicle*. FAC ¶ 16; Docket No. 56-1 (Declaration of Gautam Dutta ("Dutta Decl.")) Exh. 1.

The First Article included statements from Mr. Buttar denying the accusations: "Every survivor must be heard, and I hope to be allowed the same opportunity to be heard as well . . . Sexual harassment is despicable. Those who exploit structural sexism and power imbalances must be exposed. I am committed to putting survivors' interests before my own." First Article at 2. The article also reported on public pronouncements by the Democratic Socialists of America and SFBerniecrats—two political organizations that had previously endorsed Mr. Buttar's candidacy—that they were reevaluating their endorsements in light of the allegations. First Article at 2–4. The article reported that one local official reacted by removing his name from Mr. Buttar's website and signing "petition to unendorse him." *Id*. at 4. The article quoted Mr. Buttar's response to these political consequences: "I invite their examination of the issues and our campaign welcomes any scrutiny." *Id*. at 3.

Approximately ten minutes after the First Article was published online, SBCC representative Patricia Brooks emailed Mr. Garofoli, offering to connect the *San Francisco Chronicle* with "some people who can speak about [Mr. Buttar's] character and other claims [Ms. Croydon] has made in the past that are false—including one who alleges that she also made false claims about her husband. Would you want to speak with them? We are reluctant to attack her character out of respect to survivors . . . but they are willing to speak with you." FAC ¶ 22 (alteration in original) (emphasis omitted); *see also* Ibarguen Decl. Exh. I ("Email Correspondence") at 3–5.

The next morning, on July 22, 2020, Ms. Brooks emailed Mr. Garofoli asserting that "Ms. Croydon's allegations about Mr. Buttar were false," and that "a number of voices had been left out" from the First Article. FAC ¶¶ 30–31; Email Correspondence at 3. The email thanked Mr. Garofoli for his coverage and suggested that "there is a lot more to this story that we think will be

illuminating, and we want to make sure Shahid's full thoughts are addressed and his position is heard." Email Correspondence at 3.  The email noted that "[d]ue to time limits," SBCC "did not have time to arrange" more interviews or voices to be included in the First Article and asked Mr. Garofoli, "Can we do a follow up today or soon?"  Email Correspondence at 3.  The email did not identify any false claims in the First Article or demand any corrections or retractions.  Instead, the email stated, "We would like a story that offers Shahid the opportunity to give his perspective here and invites others who are close to this situation. We gave a limited response, but given more time, we could really tell a much bigger picture. Can you advise on what opportunities might be available for that?"  Email Correspondence at 3.  Mr. Garofoli responded that "one opportunity that might be available would be an Op-Ed. Our editorial page director . . . said he would entertain reviewing one."  Email Correspondence at 2.  Ms. Brooks submitted an op-ed on her own behalf.  Email Correspondence at 1–2.  However, it was not ultimately published in the interest of "fairness" because it did not "necessarily discredit[] the accuser's account."  FAC ¶¶ 32–34; Email Correspondence at 1.  The following day, Mr. Garofoli received an unsolicited email from the individual Chris Sampson, who claimed that Ms. Croydon was a "pathological liar" who had "harassed" one of his friends and that the *Chronicle* "should do a better job in the future or consider [its] reputation destroyed."  FAC ¶¶ 36–39.

On July 24, 2020, a group of 17 individuals who interacted with Mr. Buttar in "personal" and "political settings" published an "Open Letter of Support for Shahid Buttar" on the website *Independent Political Report*, asserting that Ms. Croydon's allegations "attempted to draw a different picture of Shahid than the one we know to be true."  FAC ¶ 41; Ibarguen Decl. Exh. H ("Open Letter").  The signatories stated:

> Recent allegations have attempted to draw a different picture of Shahid than the one we know to be true. We believe these allegations are false and ill intentioned.
>
> The accuser is well known in the DC social justice community. Unfortunately, this troubled individual has a long history of fabricating attacks against innocent people. A review of litigation she has filed in various jurisdictions would likely yield a revealing picture to an enterprising journalist. She has engaged in late-night phone harassment campaigns, false allegations and physical threats against numerous individuals over the years. She is NOT a credible

4

witness against this promising progressive leader.

Open Letter at 1.  The Open Letter did not contain any assertions that any of the signatories had any direct knowledge regarding the truth of Ms. Croydon's sexual harassment claims about Mr. Buttar.

On July 24, 2020, Hearst published a second article about the controversy in the *San Francisco Chronicle*, titled "Longtime activists defend Pelosi foe Shahid Buttar against sex harassment accusations."  FAC ¶¶ 44–46; Ibarguen Decl., Exh. B ("Follow-Up Article").  The article begins by quoting the Open Letter, recounts interviews between the *Chronicle* and three of the Open Letter signatories, and restates Mr. Buttar's defense that "Croydon's charges are false."  Follow-Up Article at 2–4.  Indeed, the vast majority of the Follow-Up Article is dedicated to interviewing and quoting those supporting Mr. Buttar:

> Supporters of Shahid Buttar, the November election opponent of House Speaker Nancy Pelosi, are rallying around him after an East Coast comedian accused him of sexually harassing her on and off for years starting nearly two decades ago.
>
> A Medium post published this week by Maryland resident Elizabeth Croydon "attempted to draw a different picture of Shahid, than the one we know to be true," several progressive activists in the Washington area, where Buttar used to live, said in an open letter.
>
> "Shahid stands for peace, justice, and democracy. He embodies anti-oppression principles and has a demonstrated record of practices that promote equity and inclusion," said the signers, who include Code Pink cofounder Medea Benjamin, a well-known former Bay Area activist who now lives in the Washington area.
>
> Croydon wrote that Buttar pursued her for sex and mocked her when she said she had been celibate for several years by choice. She wrote that "we on the left must hold ourselves to a higher standard as we are committed to creating a just and equitable world, free from sexual misconduct, misogyny and bullying."
>
> Two progressive groups that have endorsed Buttar in his campaign to deny Pelosi re-election to her San Francisco seat said they were investigating Croydon's accusations. San Francisco Supervisor Dean Preston pulled his endorsement of Buttar, a democratic socialist activist and attorney.
>
> Buttar said Croydon's charges are false.
>
> "Sexual harassment is despicable," Buttar said. "Those who exploit structural sexism and power imbalances must be exposed. I am committed to putting survivors' interests before my own."

5

> He added, "Every survivor must be heard, and I hope to be allowed the same opportunity to be heard as well."
>
> The accusations against Buttar don't ring true to some in the Washington activist community who say they know both him and Croydon.
>
> "It's totally out of character. There's nothing mean or nasty about him," Benjamin told The Chronicle. "He wouldn't insult women like that."
>
> Benjamin said Buttar "is one of these guys who is politically correct in so many ways. I know him as someone who is a feminist, who is very much against the patriarchy and calls people out on it. He's very careful about how he talks about women. He's very politically evolved."
>
> Polly Miller, who worked with Buttar on an anti-police-brutality campaign several years ago, said in an interview, "He worked with Code Pink. It's all women."
>
> Croydon's depiction of Buttar, she said, "did not match anything I ever saw."
>
> Pat Elder, a longtime activist and journalist who has worked with Buttar on a half-dozen wealth inequality and antiwar campaigns, said he "could not imagine Shahid carrying on like that. I respect the man and his intellect and his character."
>
> Croydon said Friday in an email that the open letter was part of a "smear" campaign against her.
>
> "Spending campaign time and resources on discrediting a sexual harassment survivor by essentially calling me crazy is the oldest trick in the abuser's playbook," she wrote.
>
> In an interview, she added that "no one can speak to my direct experience of Shahid."
>
> "I wanted to come forward about this much earlier, but I was terrified to do so," Croydon said. "People can hold their opinions, but they can't speak to my direct experience."

*See* Follow-Up Article. SBCC alleges, however, that the Follow-Up Article was misleading because it portrayed those who supported Mr. Buttar as his "friends," rather than as "independent political activists," and because it did not sufficiently detail Ms. Croydon's purported "long history of false accusations against political activists." FAC ¶¶ 45–46.

SBCC also alleges that other news outlets reported on Mr. Buttar's campaign following the publication of the articles. On July 21, 2020, *The Bay Area Reporter* published an article

6

regarding Ms. Croydon's accusations against Mr. Buttar. FAC ¶ 28; Ibarguen Decl., Exh. C. The article quoted two individuals who claimed to have known Mr. Buttar in the 2000s who opined that "there was *no credibility* to what Croydon alleges occurred," that Mr. Buttar was an individual who was "ethical and with so much integrity," and that Ms. Croydon has falsely accused a lawyer of sexual assault in 2006. FAC ¶ 29. On July 23, 2020, *The Intercept* published an article titled "Shahid Buttar's Bid to Unseat Nancy Pelosi Roiled By Accusations of Staff Mistreatment" that questioned Ms. Croydon's credibility but also described a "culture of misogyny" in Mr. Buttar's campaign. FAC ¶ 40; Ibarguen Decl. Exh. D at 2, 4. On September 25, 2020, *The Intercept* published an article stating that, based on its investigation, it was "not able to corroborate Ms. Croydon's allegations" and that publication interviewed multiple sources "who recounted having disturbing interactions which her that caused them to question her credibility." FAC ¶ 42; Dutta Decl. Exh. 3.

Lastly, SBCC alleges that the First Article "delivered crippling blows to Mr. Buttar's insurgent campaign against House Speaker Pelosi, who defeated Mr. Buttar on Nov. 3, 2020; and played a role in Mr. Buttar's failure to qualify for the Nov. 8, 2022 Congressional general election." FAC ¶ 56. SBCC alleges that "[h]ad Mr. Buttar been a White male such as Joe Biden or Pete Buttigieg, rather than an immigrant Muslim of Pakistani descent, the *Chronicle* would not have recklessly rushed to the publish [the First Article], let alone publish it. Instead, the *Chronicle* would have thoroughly investigated whether or not Ms. Croydon's allegations were credible." FAC ¶ 55. Regarding damages, SBCC alleges that "[t]he repeated indulgence and publication of false harassment claims by a newspaper of record destroyed the plaintiff's campaign for public office, ended any possibility of future public service, foreclosed future opportunities to return to his well-established career of non-profit advocacy, and blocked a visionary public policy agenda that had previously attracted unprecedented support." FAC ¶ 63.

B. Procedural History

SBCC filed its original complaint on July 20, 2021. Docket No. 1 ("Compl."). First, SBCC alleged defamation at common law and under Cal. Civ. Code § 45 because the "*Chronicle* published Ms. Croydon's false allegations with actual malice," and "failed to contact individuals

7

. . . [who] would have provided details of Ms. Croydon's history of lobbing false allegations." Compl. ¶¶ 57–58. Second, SBCC alleged a derivative violation of California's unfair competition law based on Hearst "maliciously defaming Buttar for Congress and Mr. Buttar." Compl. ¶¶ 65–66. Hearst filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and Cal. Civ. Proc. Code § 425.16(b)(1) on the basis that the anti-SLAPP statute applies to all SBCC's claims. Docket No. 27 ("First MTD"). The Court held that SBCC failed to state a claim of defamation under the anti-SLAPP statute and failed to state a derivative claim under California's unfair competition law. Docket No. 39 ("First MTD Order") at 20. The Court granted the motion to dismiss with prejudice with regards to the First Article because SBCC failed to plead actual malice based on any alleged failure to investigate or contact certain individuals. First MTD Order, at 14–15. The Court granted leave to amend on the Follow-Up Article "although it appears unlikely that Plaintiffs will be able to cure the deficiencies in their complaint." First MTD Order, at 20–21.

SBCC filed a First Amended Complaint. The only new language that has been added are as follows:

- 1. The First Amendment exists to protect legitimate journalism, not racist character assassination in the service of a public assault on election integrity and democratic accountability. The First Amendment is supposed to protect democracy, not invite its subversion.

- 3. On July 21, 2020, the *San Francisco Chronicle* published an article containing a false allegation that Congressional candidate Shahid Buttar had committed sexual harassment.

- 13. Mr. Buttar ran again as a candidate in the 2022 Congressional election, but did not qualify for the Nov. 8, 2022 general election.

- 32. . . . At the time, the *Chronicle*'s opinions editor was John Diaz.

- 33. . . . Specifically, Ms. Brooks responded to Mr. Garofoli's July 22, 2020 email and added Mr. Diaz to the recipient list.

- 34. In response, Mr. Diaz sent Ms. Brooks an email on July 23, 2020. . . .

- 35. Upon information and belief, Mr. Diaz was authorized to receive correction requests on behalf of the *Chronicle*'s publisher; alternatively, the *Chronicle*'s publisher had actual knowledge of Ms. Brooks' July 22, 2020 correction request within 20 days of her request.

- 46. Second, the Follow-Up Piece failed to disclose that Ms. Croydon was not only a source known to be unreliable, but had a long history of hurling false accusations – including a false allegation of sexual assault – against political activists.

- 47. The Follow-Up Piece thus deprived *Chronicle* readers of Ms. Croydon's history of hurling such false accusations, even though the July 23, 2020 *Intercept*, Mr. Sampson, and the 17 signatories of the Open Letter had laid bare obvious reasons to doubt Ms. Croydon's veracity.

- 51. In so doing [providing hyperlinks to Ms. Croydon's essay and not the Open Letter], the *Chronicle* implied that Ms. Croydon's allegations were more credible than those of any of the 17 signatories to the Open Letter.

- 53. In the United States, Islam is one of the most stigmatized religions. Only 42 percent of Americans have a favorable view of Islam, according to a 2021 Associated Press/Norc Center for Public Affairs Research poll.

- 54. Joe Biden and Pete Buttigieg, who are both White males, were both accused of sexual misconduct during their respective Presidential candidacies. The Chronicle did not rush to publish any of those accusations. Instead, the Chronicle demonstrated the care it owed its readers and the public at large.

- 56. The *Chronicle*'s publication of the Original Piece . . . played a role in Mr. Buttar's failure to qualify for the Nov. 8, 2022 Congressional general election.

*See* FAC. The FAC also included additional allegations on damages. FAC ¶¶ 64–93.

Hearst filed another motion to dismiss on the same grounds. Docket No. 47 ("Second MTD"); Docket No. 55 ("Second MTD Opp."). Also pending is Hearst's request for judicial notice, Docket No. 49 ("D's RJN"), and SBCC's request for judicial notice, Docket No. 56 ("P's RJN").

**II.     REQUEST FOR JUDICIAL NOTICE (FED. RULE OF EVIDENCE 201(B))**

The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' . . . [b]ut a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'") (first quoting *MGIC Indem.*

9

1  *Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); then quoting Fed. R. Evid. 201(b)),

2  *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

3  A.     <u>Hearst's Request for Judicial Notice</u>

4         The Court grants Hearst's request for judicial notice in support of the City's motion for

5  summary judgment. Courts may take judicial notice of a public record that is not subject to

6  reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). Courts may

7  take judicial notice of all "evidence on which the complaint 'necessarily relies' if: (1) the

8  complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no

9  party questions the authenticity of the document." *United States v. Corinthian Colls.*, 655 F.3d

10 984, 999 (9th Cir. 2011). In support of its motion to dismiss, Hearst requested judicial notice of

11 nine documents. D's RJN at 2. Exhibit A is the online version of the First Article published by

12 Hearst on July 21, 2020, which is referred to and hyperlinked in the FAC. Ibarguen Decl. Exh. A;

13 FAC ¶¶ 16, 21–22, 56, 58, 96–98. Exhibit B is the online version of the second Follow-Up Article

14 published by Hearst on July 24, 2020, which is referred to in the FAC. Ibarguen Decl. Exh. B;

15 FAC ¶¶ 44–51, 99–100. Exhibits C through F are four news articles published by other news

16 outlets (*Bay Area Reporter*, *The Intercept*, Mis*sion Local*, and *48hills*), which are referred to and

17 quoted in the FAC. Ibarguen Decl. Exh. B; FAC ¶¶ 28–29, 40, 42–43, 58. Exhibit G is Elizabeth

18 Croydon's essay published on *Medium*, which is referred to and hyperlinked in the FAC. Ibarguen

19 Decl. Exh. G; FAC ¶ 17 n.3. Exhibit H is an Open Letter published on the *Independent Political*

20 *Report* in support of Mr. Buttar, which is referred to and hyperlinked in the FAC. Ibarguen Decl.

21 Exh. H; FAC ¶ 41 n.10. Exhibit I is an email thread between SBCC and SFC employees.

22 Ibarguen Decl. Exh. I; FAC ¶¶ 30–31, 33–35. Given that each exhibit is referenced in SBCC's

23 FAC, SBCC cannot persuasively argue that these documents are "not relevant." Docket No. 57

24 (P's Objections to D's RJN). Moreover, the Court previously took judicial notice of all these

25 documents in connection with the motion to dismiss SBCC's original complaint; the FAC includes

26 all the references and allegations contained in the original complaint and refers to each of these

27 documents. First MTD Order, at 2 n.1.

28        Thus, Hearst's request for judicial notice is **GRANTED**.

B.   SBCC's Request for Judicial Notice

The Court also grants SBCC's request for judicial notice.  Exhibit 1 is the print version of the First Article, republished on July 22, 2020, which is explicitly referred to in the FAC.  Docket No. 56-1 (Declaration of Gautam Dutta ("Dutta Decl.")) Exh. 1; FAC ¶ 16 n.2.  Exhibit 2 is the print version of the second Follow-Up Piece, republished on July 25, 2020, which is referred to in the FAC.  Dutta Decl. Exh. 2; FAC ¶ 44.  Exhibit 3 is an article published in *The Intercept*, which is explicitly referred to in the FAC.  Dutta Decl. Exh. 2; FAC ¶ 42.  The Court also previously took judicial notice of the online versions of Exhibits 1 and 2, as noted above.

Thus, SBCC's request for judicial notice is **GRANTED**.

### III.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (RULE 12(B)(6))

A.   Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'"  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

11

1  unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

2  B.     Discussion

Hearst moves to dismiss SBCC's claims under California's anti-SLAPP statute, which allows for pre-trial dismissal of SLAPP suits ("strategic lawsuits against public participation"). Cal. Civ. Proc. Code § 425.16; *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). The statute aims to identify, early in the litigation process, "meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife*, 264 F.3d at 839. Federal courts in this circuit apply California's anti-SLAPP statute. *Id.* at 839–40.

"A court considering a motion to strike under the anti-SLAPP statute must engage in a two-part inquiry." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003). First, the defendant must "make an initial prima facie showing that the plaintiff's suit arises from an act [by the defendant] in furtherance of the defendant's rights of petition or free speech." *Id.* (citation omitted). Second, where a defendant makes the required prima facie showing, "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Id.* at 1110. If "a defendant makes an anti-SLAPP motion to strike founded on purely legal arguments, then the analysis is made under Fed. R. Civ. P. 8 and 12 standards." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). "If a defendant makes a special motion to strike based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6)." *Id.* at 834. Accordingly, the procedural grounds for dismissal under anti-SLAPP are identical to those under Rule 12(b)(6): a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . that is, a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555–56, 569.

1.     Step One: Applicability of the Anti-SLAPP Statute

Under the first step of *Vess*' two-step test, the Court considers whether the defendant has made an initial prima facie showing that the anti-SLAPP statute applies. As § 425.16 of the statute provides:

> [An] act in furtherance of a person's right of petition or free speech

under the United States or California Constitution in connection with a public issue includes:

(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or

(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. Code § 425.16(e). Here, SBCC's suit challenges Hearst's publication of news articles regarding the public controversy of (1) the published accusations of sexual harassment against Mr. Buttar, then a candidate for the U.S. House of Representatives; (2) Mr. Buttar's response to those allegations; and (3) the public response to those allegations by several of Mr. Buttar's political supporters and others. *Sipple v. Found. For Nat'l Progress*, 71 Cal. App. 4th 226, 240 (1999) ("[N]ews reporting is free speech and section 425.16 motions can apply to media defendants in libel actions"); *Eva v. Smith*, 89 Cal. App. 324, 328–30 (1928) ("An individual who seeks or accepts public office invites and challenges public criticism so far as it may relate to his fitness and qualifications[.] The right of criticism rests upon public policy . . ."). There is no dispute that SBCC's suit arises from a written statement by Hearst in a public forum in connection with an issue of public interest in furtherance of Hearst's right of free speech. *See* Second MTD Opp. at 12 n.51 ("Plaintiffs do not dispute that the first prong of the Anti-SLAPP analysis has been satisfied.").

        2.     Step Two: Probability of Success of the Defamation Claim

Having found that the anti-SLAPP statute applies, under the second step of *Vess*' two-step test, the Court next considers whether the plaintiff has demonstrated a probability of prevailing on the challenged claims. Here, SBCC must show (1) falsity and (2) actual malice. Having already dismissed with prejudice SBCC's claims with regards to the First Article, the Court now limits its

13

inquiry to the Follow-Up Article in this motion to dismiss. SBCC fails to plausibly allege facts showing falsity and actual malice, and thus fails to demonstrate a probability of prevailing on its defamation claim.

### a. Material Falsity

First, a plaintiff must show that each statement is materially false in the context of the whole publication. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Vogel v. Felice*, 127 Cal. App. 4th 1006, 1021–23 (2005). Media statements on matters of public interest "must be provable as false before there can be liability under state defamation law." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–20 (1990). Generalized allegations of defamation without specific allegations of the challenged speech are typically insufficient. *Flowers v. Carville*, 310 F.3d 1118, 1130–31 (9th Cir. 2002). SBCC failed to plausibly allege that the Follow-Up contained any inaccurate facts.

As the Court explained in its previous order granting Hearst's motion to dismiss:

> Plaintiffs do not plead that the Articles contained any factual inaccuracies in its account of the substance of Croydon's allegations (apart from their denial of the allegations themselves, which Defendant reported), nor do they allege that Hearst's reporting on Buttar's denial of the allegations contained any factual errors. Plaintiffs do not plead that Hearst's Reporting presented Croydon's allegations of sexual harassment as statements of fact that Buttar actually harassed Croydon. Nor could they. Hearst's Reporting does not assert or imply that Croydon's allegations were anything more than her unproven claims, which were disputed by Buttar.
>
> Instead, Plaintiffs' allegation of falsity is based on Defendant's failure to do more: Defendant did not interview and quote the Campaign's preferred sources and did not report on allegations by those sources that Croydon had made false reports of sexual harassment against other individuals in the past. Compl. ¶¶ 21, 43.
>
> However, Plaintiffs do not allege that any of their preferred sources could have offered anything but their own speculation about any of Croydon's allegations against Plaintiff Buttar. Plaintiffs do not allege that those sources had *any* firsthand knowledge as to the veracity of Croydon's allegations. There is no allegation that Defendant's omission of quotations from these sources renders anything in either Article provable as false. Moreover, Plaintiffs fail to demonstrate through their pleading that the inclusion of the opinions of the Campaign's preferred sources about Croydon's credibility based on unrelated conduct, in light of the fact that Defendant repeatedly reported Plaintiff Buttar's denial of the allegations, would have created a "different effect on the reader."

14

> *Masson*, 501 U.S. at 517 (citation omitted). Accordingly, Plaintiffs pleading of falsity appears problematic.

First MTD Order, at 11–12. This Court also rejected SBCC's argument that the Follow-Up Article misleadingly portrayed the signatories of the Open Letter as "Mr. Buttar's friends, when they are fiercely independent political activists," Compl. ¶ 42, because the article in fact accurately identified the background and professions of the named signatories. First MTD Order at 12–13. The Court found SBCC's argument that the article failed to include allegations that "Croydon had a long history of false accusation against political activists," Compl. ¶ 43, were not likely to state a defamation claim because it is unlikely that unrelated incidents undercut the veracity of the article's contents. First MTD Order at 13.

No new allegations compel otherwise. SBCC has not added factual allegations that show falsity in the Follow-Up Article. The few additional allegations are repetitive of facts previously in the original complaint (such as repeating that Ms. Croydon is an unreliable source), address irrelevant subject matter (such as making general statements about democracy, freedom of speech, and racial discrimination), or are conclusory statements (such as that Ms. Croydon was "known to be unreliable" or that there were "obvious reasons" to doubt her) which contain no new substantive facts material to falsity of the reported accusation. Thus, SBCC again fails to plausibly allege falsity.

b. <u>Actual Malice</u>

Second, even if falsity were deemed to have been sufficiently alleged, SBCC must show that the statements about Mr. Buttar in the Follow-Up Article were published with "actual malice." *See New York Times Co. v. Sullivan*, 376 U.S. 254, 285–286 (1964). The Supreme Court has reasoned that "public figures" are less vulnerable and less entitled to protection in holding the public figures must prove "actual malice" to support a defamation claim relating to their official conduct. *Reader's Dig. Assn. v. Superior Ct.*, 37 Cal. 3d 244, 252–53 (1984) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)). Mr. Buttar—a then-candidate for the U.S. House of Representatives—is a public figure that must make a showing of "actual malice" for his defamation claim. *See St. Amant v. Thompson*, 390 U.S. 727, 728 (1968) (finding "a candidate for public office" to be a public figure who must make a showing of "actual malice").

15

To show "actual malice," a public figure must demonstrate that the publisher acted with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280. SBCC contends Hearst relied on a source known to be unreliable or failed to investigate in light of a source's known lack of reliability. *See* Opp. to MTD at 13. While it is true that "actual malice can be proved by circumstantial evidence" such as "reliance upon sources known to be unreliable or . . . failure to investigate," *Balla v. Hall*, 59 Cal. App. 5th 652, 683 (2021), *review denied* (Apr. 14, 2021) (citing *Reader's Dig. Assn.*, 37 Cal. 3d at 257), the plaintiff must nonetheless prove that "the publisher himself had *serious doubts* regarding the truth of his publication." *Id.* (emphasis added).

The failure to investigate, without more, generally is insufficient. *Id.*; *see also St. Amant*, 390 U.S. at 733 (citing *New York Times*, 376 U.S. at 287–88) ("Failure to investigate does not in itself establish bad faith."); *Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1239 (N.D. Cal. 2014) ("[G]eneral allegations that a defendant should have known or should have investigated the truth of his or her statements do not adequately plead actual malice."); *Khawar v. Globe Int'l, Inc.*, 19 Cal. 4th 254, 275–76 (1998), *as modified* (Dec. 22, 1998) (citing *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 688 (1989)) ("When, as in this case, a finding of actual malice is based on the republication of a third party's defamatory falsehoods, 'failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient.'"). In *St. Amant*, the Supreme Court held that even when a publisher "had personal knowledge" of a public figure's activities, "relied solely on [an] affidavit" without additional evidence on an accuser's "reputation for veracity," "failed to verify the information with those . . . who might have known the facts," and "gave no consideration to whether or not the statements defamed" the public figure, this fell short of proving actual malice. *St. Amant*, 390 U.S. at 730. That evidence was not sufficient "to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731.

The importance of the requirement of actual malice in the context of an alleged failure to investigate and provide more complete reporting of accusations against a public figure is underscored where, as here, the defendant is not the maker of the allegedly defamatory statement,

but the reporter of it.  *Cf. Pacific Gas & Electric Co. v. Public Utilities Com.*, 475 U.S. 1, 33 (1986) ("[I]nterference with the exercise of editorial control and judgment creates a peril for the liberty of the press like government control over what is to go into a newspaper." (internal quotation marks omitted)); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.")

      Here, SBCC has again failed sufficiently to plead actual malice.  It failed to plausibly plead facts establishing that Hearst entertained serious doubts as to the truth of the Follow-Up Article.  There is no evidence that any signatory of the Open Letter had direct knowledge of the falsity of Ms. Croydon's claims about Mr. Buttar.  *See* FAC ¶ 46.  As to the assertion that "Ms. Croydon was not only a source known to be unreliable, but had a long history of hurling false accusations – including a false allegation of sexual assault – against political activists," FAC ¶ 46, there is no indication that the sources of these assertions were so reliable and the information so verified as to establishing there were "obvious reasons to doubt Ms. Croydon's veracity," as Plaintiff alleges. FAC ¶ 47.  In particular, as to the email sent to Mr. Garofoli and two other *Chronicle* employees by Mr. Chris Sampson stating that Ms. Croydon was a "pathological liar" who had "harassed" one of his friends, FAC ¶¶ 36–37, the FAC does not allege that the sender of the email had any firsthand knowledge of the disputed facts or was known as credible in the journalistic or political community; there is no disclosure of the source of Mr. Sampson's information, and no revelation as to what interests Mr. Sampson had in the situation.  In short, there is no basis establishing Hearst "in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731.  Although a publisher may be held liable if it engages in "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers," *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 158 (1967), no such showing is established by the FAC here.  There is no showing that the failure to further investigate the assertions in the Open Letter or Mr. Sampson's emails, or the editorial decision to not include a hyperlink to the Open Letter, constituted "an extreme departure from the standards of

17

investigation and reporting ordinarily adhered to by responsible publishers." *St. Amant*, 390 U.S. at 733; *Wynn*, 75 F. Supp. 3d at 1239; *Khawar*, 19 Cal. 4th at 275–76. Notably, the article in fact thoroughly summarizes the contents of the Open Letter in support of Mr. Buttar, accurately describes in large part the signatories thereof, and describes and quotes liberally from further interviews with Mr. Buttar's supporters. *See* Follow-Up Article (quoting statements by the Open Letter signatories, Medea Benjamin, Polly Miller, Pat Elder, and Mr. Buttar himself in support of Mr. Buttar).

What this Court previously explained in its previous order granting Hearst's motion to dismiss, remains true:

> First, Plaintiffs do not plead actual malice by relying on a purported failure to contact certain individuals who, based on the facts pled in the Complaint, lacked any specific or actual knowledge that Croydon's allegations against Buttar were false. Though the Complaint alleges that these individuals subjectively believed – based on their own interactions with her or with Buttar – that Croydon's allegations were not credible, the Complaint fails to allege any facts indicating that these individuals (or anyone else not contacted by Hearst) could offer actual knowledge that the specific allegations against Buttar were false. And certainly there is no allegation that Defendant knew that these individuals had actual knowledge.
>
> Second, Defendant's alleged failure to investigate by contacting preferred sources proposed by Plaintiffs is insufficient to demonstrate the articles at issue were published with *knowledge* of their falsity or reckless disregard for their truth. *Reader's Digest*, 37 Cal. 3d at 247 ("The failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy"); *see also Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) ("[F]ailure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard"); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."). Here, there is nothing alleged that would rise above, *e.g.*, negligence. Again, nothing in the Open Letter or any other source indicated that any potential source has firsthand knowledge of Croydon's allegations against Buttar and thus were particularly credible.

First MTD Order at 14–15. For the reasons stated above, the additional allegations of the FAC again fail to establish Hearst's actual malice.

Because SBCC again failed to show a likelihood of success on the defamation claim, the Court concludes that the anti-SLAPP statute bars SBCC's suit.

Because SBCC's defamation claim fails under the anti-SLAPP statute, the Court need not reach the issue of damages.

C. Leave to Amend

The Court previously dismissed the claims arising from the First Article with prejudice. First MTD Order at 21. The Court granted leave to amend the original complaint. Plaintiff was granted leave to amend before it could be dismissed with prejudice under the anti-SLAPP statute. *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004). As the Ninth Circuit has explained, "[i]f the offending claims remain in the first amended complaint, the anti-SLAPP remedies remain available to defendants." *Id.* Because SBCC's FAC again fails to survive the motion to dismiss under the anti-SLAPP statute, this time the Court dismisses the FAC with prejudice.

The Court **GRANTS** Hearst's Request for Judicial Notice and **GRANTS** SBCC's Request for Judicial Notice. The Court **GRANTS** Hearst's Motion to Dismiss **WITH PREJUDICE**.

This order thus disposes of Docket Nos. 47, 49, and 56. The Clerk is instructed to enter judgment for Defendant and close the case.

**IT IS SO ORDERED**.

Dated: February 16, 2023

_____
EDWARD M. CHEN
United States District Judge

19